# **<u>Chris Reel Documents</u>**

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 1396469-MF |
| PERSON INTERVIEWED | : | Christopher Reel |
| PLACE OF INTERVIEW | : | United States Attorney's Office<br>970 Broad St<br>Newark, NJ |
| DATE OF INTERVIEW | : | June 4, 2009 |
| TIME OF INTERVIEW | : | 2:00pm |
| INTERVIEWED BY | : | AUSA Mark Coyne, AUSA Matthew Beck and<br>Postal Inspector Ann Kolczynski |

On June 4, 2009, Christopher Reel was interviewed regarding appraisals that his business, Reel Appraisals had conducted for GMAC/RFC.

Reel stated that he has been conducting appraisals since 1984 but only became licensed in 1991 when it became a requirement. He worked at Gizzi Appraisal from 1984-1994 as an appraiser and then in 1994 formed his own company. Reel Appraisal Services conducts residential appraisals and has two appraisers including Reel. Since 1994, Reel and his associate have completed 11,250 appraisals in New Jersey.

Reel stated that he has been familiar with the Paterson, NJ area since approximately 1984. Reel did not believe that he had worked with RFC prior to receiving a telephone call from Gwen O'Connor of GMAC (located in Indiana) in late 2003 or early 2004. O'Connor said that she had an investigation and asked about appraisals being conducted in Paterson.

At this point in the interview, Reel explained the difference between regular market value appraisals and review appraisals. For a regular market value appraisal, Reel receives an order and the requestor (usually a lender) wants a value. If the property is a sale he receives the price. Since November 2005, appraisers are required to get a copy of the contract. He stated that certain appraisals do not require entry into the home but that most do. Reel then sketches, takes indoor photos, estimates the square footage, looks for comparable properties of similar size, location, use and timing. Comparables should be sales within the last six months. If there are not any comparables from this time frame, sales up to a one year period can be used with an explanation.

Reel stated that appraisals are not an exact science. He has walked away from some lenders if they put a lot of pressure on him to obtain a certain dollar amount. Appraisals are subjective and there is a margin of error to them.

For a review appraisal, Reel is supplied with an appraisal that was conducted by another appraiser. Reel fills out the Residential Field Review Report, looks at the property, takes

photographs of the front of the home and the street scene.  He has no contacts to the property so he can not enter it and he does not walk onto the property.

Reel stated that for the review appraisals in Paterson, on one occasion he looked into the house thru the windows and did not see any renovations and on another occasion he spoke with a tenant that was outside of the home.  Reel was there to review appraisals that were conducted.  In the last three or four years, interior photos needed to be taken.  He was also supplied with a sketch.

Reel reviewed a copy of the Freddie Mac 1032 form (residential field review report) to explain all of the sections that he needed to complete for a review appraisal.  The first section was sales history.  Reel would talk to Odessa from the Paterson tax office but now he goes onto the NJ tax board website for that information.  The second section was lot size.  The third section was description of site.  Reel would look at the sketch of the property and at the appraisal.  The fifth section was design.  Reel would look to see if the property was similar in area to what was on the appraisal.  The sixth section was comparable properties.  Reel researched properties on MLS (multiple listing service) from the period of the original appraisal dates.  He also would pull up comparables that were used on the appraisal.

Reel stated that a gray area in conducting appraisals was the general condition of the property as you can not assume that the property was not renovated.  Reel would look for the mention of building permits being filed.  He said that the Paterson Building Department was difficult to work with.

Reel said that the reevaluation process was bad in Paterson and led to an increase in taxes.  He said that this was a problem for honest appraisers in Paterson in 2004-2005 because comparable sales were fraudulent.  Reel said he is required to keep his appraisals for 7 years.

At this point in the interview, Reel was asked to describe the Paterson area.  The southern section runs from south of route 80 to the Clifton border and is currently inundated with the Arabic community.  The Hillcrest section runs from the west side of the river and borders Totowa and Wayne.  The northwestern section is often called Doctor's Row and is located off Broadway near the park and is west of Madison.  The homes that Reel reviewed were located in the central section which is between Madison and the river.  Reel compared the area to the central ward of Newark.  He described the area as run down with vacant lots.  When he was conducting the appraisals he said that there were some new buildings being built and there were a lot of people hanging out in the neighborhood.  He said that the houses were ok, not wonderfully maintained and were between 70-120 years old.  Often the homes were two or three family although there were some apartment buildings.  He said that the general climate was that the prices were increasing daily.

Reel said that a flip was when a property was purchased in poor condition in a good neighborhood.  He said that the Paterson market would not support flips.  In Paterson, a property could be bought cheaply and then cheap cosmetic fixes could be performed in order to make a profit of tens of thousands of dollars.  Reel said that there was no way to increase the value of a property in a short time in Paterson without putting additional square footage into the property.

He said that banks were not giving property away back then.  Overall the character of the neighborhood has not changed.

Reel said that the homes were not a step on the ladder of home ownership.  If you wanted to move up then you would probably buy property somewhere else.  He said that the area was a place that people lived because they could afford to not because they wanted to live there.  Paterson was bottom basement pricing for Passaic County.

Reel stated that he has never carried a firearm during an appraisal and does not own a firearm.

Reel knew that he was conducting the appraisals for RFC's investigative division.  He originally did not know if it was a fraud investigation but found out that it was by speaking with Gwen O'Connor.

Reel said that he met Michael Eliasof, a realtor, when Reel was conducting legitimate sale appraisals about 5 years prior to when his appraisals in Paterson were conducted.  He described Eliasof as a 6'0"-6'2" stocky (over 200lbs) white male with glasses who was approximately 60-62 years old.

Reel did not speak to Eliasof in regards to the Paterson properties.  He only spoke with Gwen O'Connor.  Gwen O'Connor said that Reel's name was referred to her by the head of Wells Fargo in Minnesota.  O'Connor said that the appraisals were for RFC's investigations unit.  Reel said that anytime that you have a request from the investigations unit that it is assumed that something is up.

Reel said that he did the appraisals one by one and that he did not make any assumptions.  He would look at the property and then answer questions on the form.  Reel said that he was fairly evident that the values were not good.

Reel said that he would give an estimate of value based on assumptions.  He said that he was not conservative in his values and was an advocate for the property.  He always tried to nail down the middle.  Reel said he may differ with other appraisals by 5-10%.  He stated that if there is a 100% difference that there must be some fraud going on.

Gwen O'Connor ordered more appraisals and gave him information about halfway through about the investigation.  Reel stated that he noticed trends: the same lender was used, the same borrower was used and all properties were flip sales.  He also remembers the entity 253 LLC popping up a lot.

Reel stated that some of the properties were bought and sold on different county boards which would hide transactions.  If someone were to look for the property only on one board, then they would miss the other transactions.

Reel stated that one red flag was comparable sales.  After the first five or six appraisals he saw that the appraiser was using their own fraudulent sales as comps.  Reel stated that he put new comps in his appraisals.  Reel made approximately $250 an appraisal.  His business was fine and he did not need to take this work.

Reel stated that his impression was that there was a lot of fraud being conducted by unknown persons in Paterson.  He had no doubts that there was fraud when the

appraisals would use their own comps from flip sales. Reel stated that there was a new section on appraisal form that requires notation of flip sales.

At this point in the interview, Reel was asked if he knew the following names: Michael Eliasof-Gwen O'Connor mentioned him; Fred Ugwu-saw his name many times; and Norman Barna-saw his name many times. Reel stated that he had spoken with the tax assessor of Paterson and that Ugwu's name had come up.

Eventually RFC took away Gwen O'Connor's ability to order appraisals. Reel said that he has seen reviews with big spreads before but not grouped together. He said when you see that it means that someone is doing something that they should not. Gwen O'Connor never gave him push back. He never met her and said that it was an arms length deal.

Reel stated that he did not take notes and that all of his documents are in the residential appraisal field review reports where he might have made notes. He stated that he takes substitute photos both for the comps that the original appraisal used and for the new comps that he used. He stated that he was looking at comps and the subject property approximately 1 ½ years after the original appraisal.

There was a letter of engagement for the properties that he appraised for RFC. Reel explained that appeal on the letter refers to a review of the appraisal.


Ann Kolczynski                                    June 9, 2009
U.S. Postal Inspector                                   Date

# RESIDENTIAL APPRAISAL FIELD REVIEW REPORT    File no  7254  LSI#40206406

The purpose of this review is to determine the completeness and accuracy of the data in the appraisal report and to verify the accuracy of the market value estimate as to the effective date of the original appraisal. The appraisal review must address all factual, judgmental, and appraisal technique discrepancies. This field review is a spot-check on the original appraisal report as part of a mortgage quality review. It is not intended to be used as a new appraisal. (Please attach a copy of the original appraisal report to this report.)

Property Address **436-438 E. 30TH STREET**    City **PATERSON**    State **NJ**    Zip Code **07504**

Legal Description **BLOCK: L1435    LOT: 20  SMSA: 0875**

Property Rights Appraised **FEE SIMPLE**    Client Reference Number **LOAN #8452379**

Effective Date of Original Appraisal and Field Review   **APPRAISED: 11/08/02  REVIEWED: 04/06/04**

Borrower **CHAMBERS**

Review Appraiser **CHRIS REEL**    Company Name **REEL APPRAISAL SERVICES**

Address **41 WOODMONT DRIVE, CHATHAM, NJ  07928 / LSI, 700 CHERRINGTON PARKWAY, CORAOPOLIS, PA 15108**

Telephone Number **(973) 301-0123**    Soc. Sec. or Tax ID Number **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**

INSTRUCTIONS: The review appraiser must personally inspect (by, at least, driving by) the exterior of the subject property and the comparables used in the analysis. Photographs are required for : the front of the comparables, the front of the subject, and the street scene of the subject property. Additional photographs are suggested if any adverse conditions that were not noted in the original appraisal are observed. (NOTE: The review appraiser is not required to inspect the interior of the subject property. The review appraiser should verify the data in the original appraisal report, using the assessment records, the real estate broker, or any other data source that he or she considers to be reliable and reasonably available.) Based on the exterior inspection of the subject and the comparables, a thorough desk review of the appraisal report, and a review of the relevant market data for the subject area, respond to the following questions, form an opinion about the appropriateness of the appraisal methods and techniques that were used, and indicate any areas of disagreement (giving reasons for the differences). Do not limit your responses to the areas provided; attach an addendum if necessary.

1. Provide a sales and finance history for the subject property for the last three years (if it is reasonably available from a data source that the review appraiser considers to be reliable).

| Conveyance Recordation Date | Sales Price | Asking Price | Mortgage Amount | Grantor / Grantee | Data Source |
|---|---|---|---|---|---|
| 04/09/02 | 139,000 | N/A | N/A | EMC MORTGAGE CO / 253 E. 33RD STREE | TAX OFFICE |
| 02/04/03 | 349,000 | N/A | N/A | 253 E. 33RD STREET LLC / CHAMBERS | TAX OFFICE |
| | | | | | |
| | | | | | |

2. Is the appraiser's overall description of the neighborhood complete and accurate ( location, general market conditions (i.e. price closings, crop failures, etc.), property values, demand / supply, marketing time, general appearance of properties, appeal to market, etc. ) ?   ☐ Yes  ☒ No  (If so, explain)  **THE NEIGHBORHOOD COMMENTS ARE INADEQUATE AND DO NOT EXPLAIN THE AREA IN ANY DETAIL. THE HIGH FOR THE SINGLE FAMILY PRICE RANGE SHOULD BE $200,000 WITH A PREDOMINANT OF $120,000. THE 2-4 FAMILY PRICE RANGE SHOULD HAVE A HIGH OF $300,000 WITH A PREDOMINANT OF $160,000. RENT CONTROLS ARE CHECKED "NO". THERE ARE RENT CONTROLS IN PATERSON WITH ALL 2 FAMILY NON-OWNER OCCUPIED AND ABOVE BEING AFFECTED.**

3. Is the appraiser's overall description of the site complete and accurate (zoning compliance, apparent adverse conditions, apparent environmental hazards, etc.)?   ☐ Yes  ☒ No   (If yes, explain)  **THE LEGAL ADDRESS FOR THE PROPERTY IS 436-438 E. 30TH STREET.**

4. Is the appraiser's overall description of the improvements complete and accurate (property description, depreciation, condition, apparent environmental hazards, etc.)?   ☐ Yes  ☒ No  (If no, explain)  **NO INTERIOR ACCESS WAS MADE AVAILABLE TO THE APPRAISER. THE APPRAISAL NOTES  THAT THE SUBJECT HAS BEEN RENOVATED.  NO PERMITS FOR ANY WORK WAS TAKEN OUT AT THE BUILDING DEPARTMENT OF PATERSON. AN INTERIOR INSPECTION IS RECOMMENDED TO ENSURE THAT RENOVATIONS WERE DONE. THE 3 CAR GARAGE WAS IN FAIR TO POOR CONDITION AT THE TIME OF REVIEW.**

5. Are the design and appeal, quality of construction, and size of the subject property similar to others in this area?   ☒ Yes  ☐ No   (If no, how is the subject different?)  **THE DESIGN & APPEAL, QUALITY OF CONSTRUCTION, AND SIZE ARE SIMILAR TO OTHERS IN THE AREA.**

6. Are the comparables used in the analysis truly comparable to the subject property, representative of the subject market, and were they the best ones available as of the effective date of this appraisal?   ☐ Yes  ☒ No   (If no, explain and provide an adjustments grid with the appropriate comparables and adjustments on an addendum.)   **SEE ATTACHED ADDENDUM.**

7. (a) Can the date of sale (contract date and/or closing/settlement date), sales price, and sales or financing concessions for the comparables be confirmed through the data source that the appraiser indicated?   ☐ Yes  ☒ No   (If no, explain.)   **SEE ADDENDUM**

(b) Were the comparables actual closed or settled sales as of the effective date of the original appraisal?   ☐ Yes  ☒ No   (If no, explain.)   **COMP 1 IS NOTED TO BE CLOSED ON 12/31/2002, WHICH WAS CLOSED 1.5 MONTHS AFTER THE APPRAISAL WAS INSPECTED AND COMPLETED. IT COULD NOT BE FOUND THROUGH  THE SOURCE INDICATED BUT WAS CLOSED, BASED ON THE REVIEWER HAVING REVIEWED THIS SAME PROPERTY'S APPRAISAL. THE APPRAISER COULD NOT HAVE KNOWN THIS CLOSING AS OF NOVEMBER 8, 2002.**

Freddie Mac Form 1032 11/09    PAGE 1 of 3    Fannie Mae Form 2000 11/09

1-4 Family Properties    1-4 Family Properties

**REEL APPRAISAL SERVICES**

GOVERNMENT EXHIBIT
BB-20

8. Is the specific data for the comparables accurate (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)? [ ] Yes [X] No
(If no, explain.) DUE TO THE FRAUDULENT NATURE OF ALL THE COMPARABLE SALES, THE DATA FOR THE COMPS IS UNRELIABLE, AS THEY ARE NOT EVEN TO BE CONSIDERED AS COMPARABLE SALES. COMP 5 IS SUPERIOR IN LOCATION AND IS NOT TO BE CONSIDERED.

9. Are the individual adjustments to the comparables reasonable and supported (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)? [ ] Yes [X] No (If no, explain.) NONE OF THE ADJUSTMENTS ARE REASONABLE AS THE PROPERTIES USED ARE NOT COMPARABLE DUE TO FRAUD, ERRONEOUS INFORMATION, OR REPORTING IRREGULARITIES. THEY ARE NOT EVEN CONSIDERED.

10. If the subject property is a small residential property (2-4) or a single-family in estate-property, are the comparable rental and expense data accurate and reasonable? [ ] Yes [X] No [ ] N/A (If no, explain.) RENTAL COMP 1 NOTES RENTAL INCOMES OF $900, $772, $744, AND $744 FOR THE 4 UNITS ON THE MLS LISTING. RENTAL COMP 2 NOTES RENTAL INCOMES OF $700, $675, $650, AND $500 FOR THE UNITS ON THE MLS LISTING. RENTAL COMP 3 NOTES RENTAL INCOMES OF $650, $800, $675, AND $625 FOR THE UNITS ON THE MLS LISTING. ALL RENTAL COMP INFORMATION IS FICTITIOUS. THE FORECASTED RENTS FOR THE SUBJECT MAKE NO SENSE AS THERE ARE 4 UNITS RANGING IN LIVING AREA FROM 735 SQ. FT. TO 789 SQ. FT., WHICH REFLECT FAIRLY SIMILAR LIVING AREA, YET THE FORECASTED RENTS RANGE FROM $900 TO $1,600. THIS CANNOT BE POSSIBLE. BASED ON ACCURATE RENTAL DATA FROM THE RENTAL COMPS, THE FORECASTED RENTS FOR THE SUBJECT WOULD RANGE FROM $675 TO $800 PER UNIT, DEPENDING ON ACCURACY OF CONDITION.

11. If the subject property is an individual unit in a condominium or PUD project, is the project description complete and accurate? [ ] Yes [ ] No [X] N/A (If no, explain.)

12. Is the estimate of market value on subject property reasonable as of the effective date of the appraisal? [ ] Yes [X] No (If no, provide an appropriate estimate of the market value for the subject property and state the assumptions (exterior inspection only, property description and condition, etc.) that the opinion is subject to.) SEE ADDENDUM

13. Has there been a substantial change in the base economy in the area since the effective date of the appraisal? [ ] Yes [X] No (If yes, explain.)

14. If the subject property is a cooperative unit, the review appraiser must address the completeness and accuracy of the original appraiser's description and analysis of the cooperative project and specifically comment on the accuracy of: (a) the number of shares attributable to the unit; (b) the pro-rata share of the blanket mortgage payments; and (c) the treatment of the monthly assessments of the comparable sales. N/A

I certify that, to the best of my knowledge and belief, the facts and data used herein are true and correct; that I personally inspected the exterior of the subject property and the comparables used in the report; that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions; that I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest in or bias with respect to the parties involved; that my compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report; and that my analyses, opinions, and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

Signature of Review Appraiser
CHRIS REEL                                                         Date
                                                                  APRIL 7, 2004

**Client Use Only**
Review Underwriter's Comments

Signature of Review Underwriter                                    Date
                                                                  NEW JERS

# RESIDENTIAL APPRAISAL FIELD REVIEW REPORT

File no. __7056 LSI#31203229__

The purpose of this review is to determine the completeness and accuracy of the data in the appraisal report and to verify the accuracy of the market value estimate as to the effective date of the original appraisal. The appraisal review must address all factual, judgemental, and appraisal technique discrepancies. This field review is a spot-check on the original appraisal report as part of a mortgage quality review. It is not intended to be used in a new appraisal. (Please attach a copy of the original appraisal report to this report.)

Property Address __166 NORTH 3RD STREET__ City __PATERSON__ State __NJ__ Zip Code __07522__

Legal Description __BLOCK: A0029  LOT: 2  SMSA: 0875__

Property Rights Appraised __FEE SIMPLE__ Client Reference Number __LOAN #8376533__

Borrower __MASON__

Effective Date of Original Appraisal and Field Review   APPRAISED: 10/16/02   REVIEWED: 12/18/03

Review Appraiser __CHRIS REEL__ Company Name __REEL APPRAISAL SERVICES__

Address __41 WOODMONT DRIVE, CHATHAM, NJ 07928 / LSI @ APPRAISAL ENHANCEMENT SERVICES, 100 N. WIGET LA., #180, WALNUT CREEK, CA 94598__

Telephone Number __(973) 301-0123__ Soc. Sec. or Tax ID Number __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__

INSTRUCTIONS: The review appraiser must personally inspect (by, at least, driving by) the exterior of the subject property and the comparables used in the analysis. Photographs are required for - the front of the comparables, the front of the subject, and the street scene of the subject property. Additional photographs are suggested if any adverse conditions that were not noted in the original appraisal are observed. (NOTE: The review appraiser is not required to inspect the interior of the subject property. The review appraiser should verify the data in the original appraisal report, using the assessment records, the real estate broker, or any other data source that he or she considers to be reliable and reasonably available.) Based on the exterior inspection of the subject and the comparables, a thorough desk review of the appraisal report, read a review of the relevant market data for the subject area, respond to the following questions. form an opinion about the appropriateness of the appraisal methods and techniques that were used, and indicate any areas of disagreement (giving reasons for the differences). Do not limit your responses to the space provided; attach an addendum if necessary.

1. Provide a sales and finance history for the subject property for the last three years (if it is reasonably available from a data source that the review appraiser considers to be reliable)

| Conveyance Recordation Date | Sales Price | Asking Price | Mortgage Amount | Grantor / Grantee | Data Source |
|---|---|---|---|---|---|
| 03/00 | 57,000 | N/A | N/A | N/A | TAX OFFICE |
| 11/21/02 | 270,000 | N/A | N/A | UGWU / MASON | TAX OFFICE |
| | | | | | |
| | | | | | |

2. Is the appraiser's overall description of the neighborhood complete and accurate ( location, general market conditions (i.e. plant closings, crop failures, etc.), property values, demand / supply, marketing time, general appearance of properties, appeal to market, etc )? [ ] Yes [X] No (If no, explain.) **THE NEIGHBORHOOD COMMENTS ARE ADEQUATE AND ACCEPTABLE. THERE ARE SOPME VACANT LOTS THROUGHOUT THE AREA WHICH WERE NOT NOTED. THE OWNER OF THE SUBJECT PROPERTY IS NOTED AS "PALMIERI ASSOCIATES LLC" THIS IS NOT RECORDED AT THE TAX OFFICE AND DOES NOT SHOW THIS OWNER. RENT CONTROLS SHOULD BE CHECKED "YES"**

3. Is the appraiser's overall description of the site complete and accurate (zoning compliance, apparent adverse conditions, apparent environmental hazards, etc.)? [ ] Yes [X] No (If no, explain.) **ZONING IS INACCURATE. ZONING SHOULD BE R-3 WHICH HAS A MINIMUM LOT SIZE OF 50 X 100. THE SUBJECT IS OF LEGAL NON-CONFORMING USE AS IT PREDATES THE CURRENT MINIMUM LOT SIZE WITHIN THE ZONE. SHOULD THE DWELLING BE DESTROYED IN EXCESS OF 50%, A VARIANCE IS REQUIRED TO RE-BUILD.**

4. Is the appraiser's overall description of the improvements complete and accurate (property description, depreciation, condition, apparent environmental hazards, etc.)? [ ] Yes [X] No (If no, explain.) **THERE IS NOO DRIVEWAY FOR THE SUBJECT. THE SUBJECT IS NOTED TO BE TENANT OCCUPIED ON PAGE 1, AND NOTES NO VACANCY ON PAGE 3, BUT ALSO NOTES 1 VACANT UNIT ON PAGES 3 & 4. THE EXTERIOR OF THE DWELLING IS ASBESTOS SHINGLE, NOT SIDING. THE DWELLING IS 2.5 STORIES. IT IS NOTED AT THE TIME OF INSPECTION THAT THE SECOND FLOOR WAS UNDER "GUT RENOVATIONS" & THE APPRAISAL WAS DONE "SUBJECT TO COMPLETION AS PER PLANS AND SPECIFICATIONS". NO COMPLETION CERTIFICATE WAS PROVIDED WITH THE APPRAISAL AND THERE DID NOT APPEAR TO BE ANY RENOVATIONS UPON EXTERIOR INSPECTION. AN INTERIOR INSPECTION IS RECOMMENDED.**

5. Are the design and appeal, quality of construction, and size of the subject property similar to others in this area? [X] Yes [ ] No (If no, how is the subject different?)

6. Are the comparables used in the analysis truly comparable to the subject property, representative of the subject market, and were they the best ones available as of the effective date of this appraisal? [X] Yes [ ] No (If no, explain and provide as adjustments grid with the appropriate comparables and adjustments on an addendum.) **COMPS 1 & 3 ARE NOT CLOSED SALES FROM THE SOURCE INDICATED. THEY WERE NOT LISTED OR SOLD THROUGH THE MLS AND NO INTERIOR INFORMATION WAS AVAILABLE FOR COMP 3. COMP 1 WAS AVAILABLE ONLY AS THE REVIEW APPRAISER HAS ACCESS TO THE INFORMATION FROM COMP 1 THROUGH A PREVIOUS REVIEWED APPRAISAL OF THIS PROPERTY.**

7. (a) Can the date of sale (contract date and/or closing/settlement date), sales price, and sales or financing concessions for the comparables be confirmed through the data source that the appraiser indicated? [X] Yes [ ] No (If no, explain.) **COMPS 1 HAS 1,972 SQ. FT. OF LIVING AREA. IT HAS 4 PORCHES. COMP 2 IS APPROX. 2,200 SQ. FT. OF LIVING AREA, IS SUPERIOR IN LOCATION IN AN AREA OF HIGHER PRICED HOMES, AND HAS A GARAGE AND A PORCH. COMP 3 HAS NO INFORMATION AVAILABLE & CANNOT BE FOUND THROUGH MLS SOURCES AND NO INFORMATION IS AVAILABLE FOR THESE SALES FROM THE TAX OFFICE. THE SALES DATE AND PRICES ARE RECORDED AT THE TAX OFFICE.**

(b) Were the comparables actual closed or settled sales as of the effective date of the original appraisal? [X] Yes [ ] No (If no, explain.) **ALL WERE CLOSED SALES AS OF THE EFFECTIVE DATE.**

REEL APPRAISAL SERVICES

GOVERNMENT EXHIBIT
BB-31

8. Is the specific data for the comparables accurate (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?   ☐ Yes  ☒ No

(If no, explain )   COMP 1 IS 1,972 SQ. FT. OF LIVING AREA AND HAS A 4 PORCHES, COMP 2 IS SUPERIOR IN LOCATION, HAS 2 PORCHES, AND 1 GARAGE, AND IS APPROX. 2,200 SQ. FT. OF LIVING AREA, AND IS ALSO ON A LARGER LOT. COMP 3 HAS NO INFORMATION AVAILABLE BUT IS ON A LARGER LOT.

9. Are the individual adjustments to the comparables reasonable and supported (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?   ☐ Yes  ☒ No   (If no, explain )   THE COMPS ALL HAVE ADJUSTED SALES PRICES WHICH ARE HIGHER THAN THE ESTIMATE OF VALUE. COMPS 1 & 2 SHOULD HAVE DIFFERING ADJUSTMENTS FOR LIVING AREA. COMP 2 NOTES NO RENOVATIONS UPON LISTING REVIEW.

10. If the subject property is a small residential property (2-4) or a single-family investment property, are the forecasted rental and expenses data accurate and reasonable?   ☐ Yes  ☒ No  ☐ N/A   (If no, explain )   THE RENTAL COMPS DO NOT SUPPORT THE FORECAST RENTAL INCOME OF $1,400 PER MONTH FOR THE SECOND UNIT. THIS UNIT SHOULD HAVE A FORECASTED RENT NO HIGHER THAN $1,200.

11. If the subject property is an individual unit in a condominium or PUD project, is the project description complete and accurate?   ☐ Yes  ☐ No  ☒ N/A   (If no, explain )

12. Is the estimate of market value on subject property reasonable as of the effective date of the appraisal?   ☐ Yes  ☒ No   (If no, provide an appropriate estimate of the market value for the subject property and state the assumptions (exterior inspection only, property description and condition, etc.) that the opinion is subject to.)   BASED ON THE ASSUMPTIONS THAT THE SIZE, SURFACES, AND CONDITION OF THE SUBJECT IS AS REPORTED, AND THAT A SATISFACTORY COMPLETION CERTIFICATE IS AVAILABLE TO ENSURE THE RENOVATIONS OF THE SECOND FLOOR WHICH ARE NOT IN EVIDENCE UPON EXTERIOR INSPECTION, AND BASED ON ACCURATE SALES INFORMATION, THE ADJUSTED RANGE OF VALUES FOR THE SUBJECT WOULD SUPPORT THE ESTIMATE OF VALUE OF $270,000.

13. Has there been a substantial change in the base economy in the area since the effective date of the appraisal?   ☐ Yes  ☒ No   (If yes, explain )

14. If the subject property is a cooperative unit, the review appraiser must address the completeness and accuracy of the original appraiser's description and analysis of the cooperative project and specifically comment on the accuracy of (a) the number of shares attributable to the unit, (b) the pro-rata share of the blanket mortgage payments, and (c) the treatment of the monthly assessments of the comparable sales.   N/A

I certify that, to the best of my knowledge and belief, the facts and data stated herein are true and correct, that I personally inspected the exterior of the subject property and the comparables used in the report, that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions; that I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest in or bias with respect to the parties involved; that my compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report; and that my analyses, opinions, and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

Signature of Review Appraiser
CHRIS REEL
**Client Use Only**

Date
DECEMBER 19, 2003

Review Underwriter's Comments

Signature of Review Underwriter _____   Date _____   NEW JERS

Freddie Mac Form 1032 11/89          PAGE 2 of 3                    Fannie Mae Form 2000 11/89
1-4 Family Properties                                               1-4 Family Properties

# RESIDENTIAL APPRAISAL/FIELD REVIEW REPORT

The purpose of this review is to determine the completeness and accuracy of the data in the appraisal report and to verify the accuracy... This field review is a spot-check on the original appraisal report as part of a mortgage quality review. It is not intended to be used as a new appraisal. (Please attach a copy of the original appraisal report to this report.)

Property Address 318 VAN HOUTEN STREET   City PATERSON   State NJ   Zip Code 07501

Legal Description   BLOCK: G0791   LOT: 2   SMSA: 0875

Property Rights Appraised FEE SIMPLE   Client Reference Number LOAN #8535919

Effective Date of Original Appraisal and Field Review   APPRAISED: 02/07/03   REVIEWED: 12/17/03

Borrower STERLING   Company Name REEL APPRAISAL SERVICES

Review Appraiser CHRIS REEL

Address 11 WOODMONT DRIVE, CHATHAM, NJ 07928 - LM or APPRAISAL ENHANCEMENT SERVICES, 100 N. WIGET LA., #150, WALNUT CREEK, CA 94598

Telephone Number (973) 301-0123   Soc. Sec. or Tax ID. Number 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

INSTRUCTIONS: The review appraiser must personally inspect (by, at least, drive-by) the exterior of the subject property and the comparables used in the analysis. Photographs are required for: the front of the comparables, the front of the subject, and the street scene of the subject property. Additional photographs are suggested if any adverse conditions that were not noted in the original appraisal are observed. (NOTE: The review appraiser is not required to inspect the interior of the subject property. The review appraiser should verify the data in the original appraisal report, using the assessment records, the real estate broker, or any other data source that he or she considers to be reliable and reasonably available.) Based on the exterior inspection of the subject and the comparables, a thorough desk review of the appraisal report, and a review of the relevant market data for the subject area, respond to the following questions. Do not limit your responses to the areas provided; attach an addendum if necessary.

**1. Provide a sales and finance history for the subject property for the last three years (if it is reasonably available from a data source that the review appraiser considers to be reliable)**

| Conveyance Recordation Date | Sales Price | Asking Price | Mortgage Amount | Grantor / Grantee | Data Source |
|---|---|---|---|---|---|
| 09/05/02 | $41,900 | N/A | N/A | CONTIMORTGAGE INC / UGWU | TAX OFFICE |
| 02/21/03 | $190,000 | N/A | N/A | UGWU / STERLING | TAX OFFICE |

**2. Is the appraiser's overall description of the neighborhood complete and accurate (location, general market conditions i.e. plant closings, crop failures, etc.), property values, demand / supply, marketing time, general appearance of properties, appeal to market, etc.)?**   [X] Yes  [ ] No (If no, explain)   THE NEIGHBORHOOD DESCRIPTION IS ACCEPTABLE.

**3. Is the appraiser's overall description of the site complete and accurate (zoning compliance, apparent adverse conditions, apparent environmental hazards, etc.)?**   [ ] Yes  [X] No (If no, explain)   ZONING IS INCORRECT. THE SUBJECT IS IN THE R-3 ZONE, ALLOWING 1-3 FAMILY DWELLINGS WITH A MINIMUM LOT SIZE FOR 2 FAMILIES BEING 50 X 100. THE SUBJECT IS OF LEGAL NON-CONFORMING USE AS IT PREDATES THE CURRENT MINIMUM LOT SIZE. SHOULD THE DWELLING BE DESTROYED, A VARIANCE IS REQUIRED TO RE-BUILD. THERE IS A LIST PRICE NOTED AS $190,000. THE PROPERTY WAS NOT LISTED WITH THE MLS. THE OWNER IS NOT, AND HAD NOT BEEN "ROBLES" AS PER ASSESSOR'S RECORDS.

**4. Is the appraiser's overall description of the improvements complete and accurate (property description, depreciation, condition, apparent environmental hazards, etc.)?**   [ ] Yes  [X] No (If no, explain)   SEE ATTACHED ADDENDUM.

**5. Are the design and appeal, quality of construction, and size of the subject property similar to others in this area?**   [ ] Yes  [X] No (If no, how is the subject different?)   THE SUBJECT CONSISTS OF 2 DWELLINGS ON ONE LOT. THEY ARE BOTH SMALL DWELLINGS. THIS IS NOT TYPICAL TO THE AREA. ALL COMPS ARE 2 FAMILY PROPERTIES WITH NO PROPERTIES WITH MULTIPLE BUILDINGS AVAILABLE AS SALES. THE APPEAL & QUALITY OF CONSTRUCTION IS SIMILAR TO OTHERS IN THE AREA. IT IS SMALLER THAN TYPICAL FOR A 2 FAMILY DWELLING.

**6. Are the comparables used in the analysis truly comparable to the subject property, representative of the subject market, and were they the best ones available as of the effective date of this appraisal?**   [ ] Yes  [X] No (If no, explain and provide an adjustment grid with the appropriate comparables and adjustments on an addendum.)   THE COMPS ARE ADEQUATE BUT A SMALLER COMP, IN TERMS OF LIVING AREA, SHOULD HAVE BEEN UTILIZED. THE INFORMATION FOR THE COMPARABLE SALES IS INCORRECT.

**7. (a) Can the date of sale (contract date and/or closing settlement date), sales price, and sales or financing concessions for the comparables be confirmed through the data source that the appraiser indicated?**   [X] Yes  [ ] No (If no, explain)   YES, THE SALES DATE, SALES PRICE, AND CONCESSIONS ARE ACCURATE.

**(b) Were the comparables actual closed or settled sales as of the effective date of the original appraisal?**   [X] Yes  [ ] No (If no, explain)   YES, THE COMPARABLES WERE CLOSED SALES AS OF THE EFFECTIVE DATE OF THE APPRAISAL.

Freddie Mac Form 1032 11/89   PAGE 1 of 3   Fannie Mae Form 2000 11/89
1-4 Family Properties   1-4 Family Properties

REEL APPRAISAL SERVICES

GOVERNMENT EXHIBIT
BB-32

RESIDENTIAL APPRAISAL FIELD REVIEW REPORT   File # ____ 042-E5P3312021121

8. Is the specific data for the comparables accurate (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)? [ ] Yes [ ] No   [X] No
(If no, explain)   COMP 1 IS APPROX. 2,000 SQ. FT. OF LIVING AREA AND HAS A FINISHED ATTIC. LOT SIZE IS 40 X 100. COMP 2 IS APPROX. 1,600 SQ. FT. OF LIVING AREA AND IS SUPERIOR IN CONDITION AS THE SUBJECT WAS NOT RENOVATED. COMP 3 IS APPROX. 1,800 SQ. FT. OF LIVING AREA. IT HAS NO PARKING. IT HAS 2 PORCHES AND IS SUPERIOR IN CONDITION AS IT WAS RENOVATED.

9. Are the individual adjustments to the comparables reasonable and supported (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)? [ ] Yes [X] No   (If no, explain)   LIVING AREA, CONDITION, AND ATTIC FINISH ADJUSTMENTS SHOULD BE DIFFERNET BASED ON ACCURATE INFORMATION.

10. If the subject property is a small residential property (2-4) or a single-family investment property, are the comparable rental and expense data accurate and reasonable?
[X] Yes [ ] No [ ] N/A   (If no, explain)   THE RENTAL AND EXPENSE DATA APPEARS ADEQUATE WITH THE FRONT UNIT RENT FORECASTS BEING LOWERED DUE TO LACK OF RENOVATION, AS REPORTED ON THE APPRAISAL.

11. If subject property is an individual unit in a condominium or PUD project, is the project description complete and accurate? [ ] Yes [ ] No [X] N/A   (If no, explain)

12. Is the estimate of market value on subject property reasonable as of the effective date of the appraisal? [ ] Yes [X] No   (If no, provide an appropriate estimate of the market value for the subject property and state the assumptions (exterior inspection only, property description and condition, etc.) that the opinion is subject to.)   BASED ON THE ASSUMPTION THAT THE REAR DWELLING WAS RENOVATED ( WAS NOT INSPECTED ), AND BASED ON THE ACCURATE INFORMATION FOR THE COMPARABLE SALES IN TERMS OF SIZE & CONDITION, AND BASED ON THE FRONT UNIT BEING UNRENOVATED, THE ESTIMATE OF VALUE OF $190,000 IS NOT SUPPORTABLE.
BASED ON THESE ASSUMPTIONS STATED, THE ESTIMATE OF VALUE, AS OF THE EFFECTIVE DATE OF THE APPRAISAL, IS ESTIMATED AT $160,000.

13. Has there been a substantial change in the base economy in the area since the effective date of the appraisal? [ ] Yes [X] No   (If yes, explain)

14. If the subject property is in a competitive rental or sale area, were any comparable rental data address the comparables and accuracy of the original appraiser's description and analysis of the comparative rentals

# RESIDENTIAL APPRAISAL FIELD REVIEW REPORT   File no. 7043 LSI/03/202115

The purpose of this review is to determine the completeness and accuracy of the data in the appraisal report and to verify the accuracy of the market value estimate as to the effective date of the original appraisal. The appraisal review must address all factual, judgmental, and appraisal technique discrepancies. This field review is a spot-check on the original appraisal report as part of a mortgage quality review. It is not intended to be used as a new appraisal. (Please attach a copy of the original appraisal report to this report.)

Property Address **113 STRAIGHT STREET**  City **PATERSON**  State **NJ**  Zip Code **07501**
Legal Description **BLOCK: D0533   LOT: 18   SMSA: 0875**
Property Rights Appraised **FEE SIMPLE**  Client Reference Number **LOAN #8490139**
Effective Date of Original Appraisal and Field Review **APPRAISED: 04/01/03   REVIEWED: 12/22/03**
Borrower **STERLING**
Review Appraiser **CHRIS REEL**  Company Name **REEL APPRAISAL SERVICES**
Address **41 WOODMONT DRIVE, CHATHAM, NJ 07928 / LSI @ APPRAISAL ENHANCEMENT SERVICES, 100 N. WIGET LA., #150, WALNUT CREEK, CA 94598**
Telephone Number **(973) 301-0123**  Soc. Sec. or Tax ID Number **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**

INSTRUCTIONS: The review appraiser must personally inspect (by, at least, driving by) the exterior of the subject property and the comparables used in the analysis. Photographs are required for: the front of the comparables, the front of the subject, and the street scene of the subject property. Additional photographs are suggested if any adverse conditions that were not noted in the original appraisal are observed (NOTE: The review appraiser is not required to inspect the interior of the subject property. The review appraiser should verify the data in the original appraisal report, using the assessment records, the real estate broker, or any other data source that he or she considers to be reliable and reasonably available.) Based on the exterior inspection of the subject and the comparables, a thorough desk review of the appraisal report, and a review of the relevant market data for the subject area, respond to the following questions. form an opinion about the appropriateness of the appraisal methods and techniques that were used, and indicate any areas of disagreement (giving reasons for the differences). Do not limit your responses to the space provided; attach an addendum if necessary.

1. Provide a sales and finance history for the subject property for the last three years (if it is reasonably available) from a data source that the review appraiser considers to be reliable.

| Conveyance Recordation Date | Sales Price | Asking Price | Mortgage Amount | Grantor / Grantee | Data Source |
|---|---|---|---|---|---|
| 12/24/02 | $75,000 | N/A | N/A | CAMPBELL / 253 E. 33RD STREET LLC | TAX OFFICE |
| 02/13/03 | $280,000 | N/A | N/A | 253 E. 33RD STREET LLC / STERLING | TAX OFFICE |
| | | | | | |
| | | | | | |

2. Is the appraiser's overall description of the neighborhood complete and accurate ( location, general market conditions ( i.e., plant closings, crop failures, etc.) property values, demand / supply, marketing time, general appearance of properties, appeal to market, etc. )*  ☐ Yes  ☒ No  (If no, explain)  SEE ADDENDUM

3. Is the appraiser's overall description of the site complete and accurate (zoning compliance, apparent adverse conditions, apparent environmental hazards, etc.)?  ☐ Yes  ☒ No
(If no, explain)  ZONING IS INCORRECT. THE SUBJECT IS IN THE R-4 ZONE, ALLOWING 1-4 FAMILY DWELLINGS WITH A MINIMUM LOT SIZE OF 50 X 100. THE SUBJECT IS OF LEGAL NON-CONFORMING USE AS IT PREDATES THE CURRENT MINIMUM LOT FRONTAGE, LOT DEPTH, AND LOT SIZE. SHOULD THE DWELLING BE DESTROYED, A VARIANCE IS REQUIRED TO RE-BUILD. THE SUBJECT IS LOCATED ON A SLOPING LOT.

4. Is the appraiser's description of the improvements complete and accurate (property description, depreciation, condition, apparent environmental hazards, etc.)?  ☐ Yes  ☒ No
(If no, explain)  THE SUBJECT SKETCH IS NOT LABELED AND APPEARS TO BE INCORRECT. AT THE TIME OF REVIEW THE EXTERIOR WAS MEASURED WITH THE LIVING AREA BEING 929 SQ. FT. ON LEVEL 1 AND ALSO ON LEVEL 2, AND 344 SQ. FT. ON LEVEL 3, FOR A TOTAL OF 2,202 SQ. FT.. THE BASEMENT SQ. FT. IS ALSO INCORRECT. THE THIRD LEVEL IS ESTIMATED DUE TO LACK OF KNEEWALL INSPECTION. THE EXTERIOR IS ALUMINUM SIDING, NOT VINYL. THE SUBJECT IS NOTED TO HAVE 2 UNITS VACANT ON PAGES 1&3, BUT SHOWS NO VACANT UNITS ON PAGES 3&4. THE APPRAISAL NOTES THE UNIT TO BE RECENTLY RENOVATED, WITH NO EVIDENCE OF ANY RENOVATIONS UPON EXTERIOR INSPECTION, WITH ONE TENANT NOTING THAT NO RENOVATIONS WERE COMPLETED ON THEIR UNIT. NO INTERIOR ACCESS WAS MADE AVAILABLE.

5. Are the design and appeal, quality of construction, and size of the subject property similar to others in this area?  ☒ Yes  ☐ No
(If no, how is the subject different?)

6. Are the comparables used in the analysis truly comparable to the subject property, representative of the subject market, and were they the best ones available as of the effective date of this appraisal?  ☐ Yes  ☒ No  (If no, explain and provide an appropriate comparables and adjustments on an addendum.)  ALL ARE POOR INDICATORS AS SALES WITHIN DIFFERENT AREAS OF PATERSON, WHICH ARE ALL VASTLY SUPERIOR IN LOCATION, WITH THE COMPS BEING IN BETTER CONDITION THAN THE SUBJECT. NONE OF THE NEARBY COMPS ARE UTILIZED WITH THE SALES USED NOT BEING COMPARABLE TO THE SUBJECT.
SEE SALES GRID.

7. (a) Can the date of sale (contract date and/or closing/settlement date), sales price, and sales or financing concessions for the comparables be confirmed through the data source that the appraiser indicated?  ☐ Yes  ☒ No  (If no, explain)  COMP 1 HAS A SALES PRICE OF $298,000, AS PER MLS LISTING.

(b) Were the comparables actual closed or settled sales as of the effective date of the original appraisal?  ☒ Yes  ☐ No  (If no, explain)  ALL WERE CLOSED SALES AS OF THE EFFECTIVE DATE.

Freddie Mac Form 1032 11/89  
1-4 Family Properties  PAGE 1 of 3  Fannie Mae Form 2000 11/89  
1-4 Family Properties

REEL APPRAISAL SERVICES

GOVERNMENT EXHIBIT
BB-33

8. Is the specific data for the comparables accurate (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)? ☐ Yes ☒ No
(If so, explain.) ALL COMPS ARE SUPERIOR IN LOCATION. COMP 1 HAS A LOT SIZE OF 38 X 100, HAS 14 ROOMS, AND 4 PORCHES. COMPS 2 & 3 ARE SUPERIOR IN CONDITION BASED ON EXTERIOR INSPECTION AND LISTING REVIEW. COMP 3 IS APPROXIMATELY 2,000 SQ. FT. OF LIVING AREA AND HAS 2 PORCHES.

9. Are the individual adjustments to the comparables reasonable and supported (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)? ☐ Yes ☒ No  (If so, explain) ALL SHOULD HAVE EXTREMELY LARGE ADJUSTMENTS FOR LOCATION. COMPS 2 & 3 SHOULD HAVE ADJUSTMENT FOR CONDITION. THE PARKING ADJUSTMENTS ARE TOO LOW. THERE SHOULD BE LARGER LOT SIZE ADJUSTMENTS ON ALL COMPS. COMPS 1 & 2 ARE LARGER IN LIVING AREA BASED ON ACCURATE DIMENSIONS FOR THE SUBJECT.

10. If the subject property is a small residential property (2-4) or a single-family investment property, are the comparable rental and expense data accurate and reasonable?
☐ Yes ☒ No ☐ N/A  (If so, explain.) RENTAL COMP 1 IS TOTALLY RENOVATED AND IS IN A SUPERIOR LOCATION. IT HAS A FINISHED BASEMENT. RENTAL COMP 2 IS SUPERIOR IN LOCATION, IS APPROXIMATELY 2,400 SQ. FT., WITH 1,200 SQ. FT. PER FLOOR AND HAS A FINISHED BASEMENT. RENTAL COMP 3 IS SUPERIOR IN LOCATION AND HAS A RENT ON THE FIRST LEVEL OF $700, NOT $1,000. THE SECOND UNIT IS OWNER OCCUPIED AND HAS NO RENTAL INCOME OF $1,800. THE FORECASTED RENTS FOR THE SUBJECT ARE BASED ON LOCATION, CONDITION, AND MARKET RENTS IN THE AREA, WITH THE FIRST FLOOR FORECAST AT $800 PER MONTH, AND THE SECOND FLOOR AT NO MORE THAN $950 PER MONTH.

11. If the subject property is an individual unit in a condominium or PUD project, is the project description complete and accurate? ☐ Yes ☐ No ☒ N/A  (If so, explain.)

12. Is the estimate of market value on subject property reasonable as of the effective date of the appraisal? ☐ Yes ☒ No  ( If no, provide an appropriate estimate of the market value for the subject property and state the assumptions (exterior inspection only, property description and condition, etc.) that the opinion is subject to. ) BASED ON ACCURATE MEASUREMENTS OF THE SUBJECT, THE LACK OF NOTED RENOVATIONS, AND GIVEN THE SUBJECT'S LOCATION, THE COMPS UTILIZED ARE POOR, WITH NUMEROUS BETTER COMPARABLE SALES. THE VALUE OF $280,000 IS NOT SUPPORTABLE. THE ESTIMATE OF VALUE FOR THE SUBJECT IS $135,000.

13. Has there been a substantial change in the base economy in the area since the effective date of the appraisal? ☐ Yes ☒ No  (If yes, explain.)

14. If the subject property is a cooperative unit, the review appraiser must address the completeness and accuracy of the original appraiser's description and analysis of the cooperative project and specifically comment on the accuracy of (a) the number of shares attributable to the unit, (b) the pro-rata share of the blanket mortgage payments, and (c) the treatment of the recently assessments of the comparable sales N/A

I certify that, to the best of my knowledge and belief, the facts and data used herein are true and correct, that I personally inspected the exterior of the subject property and the comparables used in the report, that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions; that I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest in or bias with respect to the parties involved, that my compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report, and that my analyses, opinions, and conclusions were developed, and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

Signature of Review Appraiser _Chris Reel_   Date DECEMBER 22, 2003
CHRIS REEL
Client Use Only
Review Underwriter's Comments

Signature of Review Underwriter   Date

NEW JERS

# RESIDENTIAL APPRAISAL FIELD REVIEW REPORT   File No. 7252 Case No. 206399

The purpose of this review is to determine the completeness and accuracy of the data in the appraisal report and to verify the accuracy of the market value estimate as to the effective date of the original appraisal. The appraisal report must address all factual, judgmental, and appraisal technique discrepancies. This field review is a spot-check on the original appraisal report as part of a mortgage quality review. It is not intended to be used as a new appraisal. (Please attach a copy of the original appraisal report to this report.)

Property Address **44 WATSON STREET**   City **PATERSON**   State **NJ**   Zip Code **07522**

Legal Description **BLOCK : A0022   LOT : 16   SMSA : 0875**

Property Rights Appraised **FEE SIMPLE**   Client Reference Number **LOAN #8490137**

Effective Date of Original Appraisal and Field Review   APPRAISED : 04/01/03   REVIEWED : 03/15/04

Borrower **HENRY**

Review Appraiser **CHRIS REEL**   Company Name **REEL APPRAISAL, SERVICES**

Address **41 WOODMONT DRIVE, CHATHAM, NJ 07928 / USE or  700 CHERRINGTON PARKWAY, CORAOPOLIS, PA 15108**

Telephone Number **(973) 301-0123**   Soc Sec or Tax ID Number **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**

INSTRUCTIONS: The review appraiser must personally inspect (by, at least, driving by) the exterior of the subject property and the comparables used in the analysis. Photographs are required for the front of the comparables, the front of the subject, and the street scene of the subject property. Additional photographs are suggested if any adverse conditions that were not noted in the original appraisal are observed. (NOTE: The review appraiser is not required to inspect the interior of the subject property. The review appraiser should verify the data in the original appraisal report, using the assessment records, the real estate broker, or any other data source that he or she considers to be reliable and reasonably available.) Based on the exterior inspection of the subject and the comparables, a thorough desk review of the appraisal report, and a review of the relevant market data for the subject area, respond to the following questions. Your responses to the questions about the appropriateness of the appraisal methods and techniques that were used, and indicate any areas of disagreement (giving reasons for the differences). Do not limit your responses to the space provided (attach an addendum if required).

1. Provide a sales and finance history for the subject property for the last three years (if it is reasonably available from a data source that the review appraiser considers to be reliable):

| Conveyance Recordation Date | Sales Price | Asking Price | Mortgage Amount | Grantor / Grantee | Data Source |
|---|---|---|---|---|---|
| 02/26/03 | 260,000 | N/A | N/A | UGWU/HENRY | TAX OFFICE |
| 11/05/02 | 35,500 | N/A | N/A | FAST FISH HOLDINGS LLC/UGWU | TAX OFFICE |
| 08/12/02 | 0 | N/A | N/A | HAWTHORNE/FAST FISH HOLDINGS LLC | TAX OFFICE |

2. Is the appraiser's overall description of the neighborhood complete and accurate (location, general market conditions (i.e. plant closings, crop failures, etc.), property values, demand, supply, marketing time, general appearance of properties, appeal to market, etc.)?   ☐ Yes   ☒ No (If no, explain.)   **THE NEIGHBORHOOD COMMENTS ARE INADEQUATE AND UNACCEPTABLE. THERE ARE SOME VACANT LOTS THROUGHOUT THE AREA WHICH ARE NOT NOTED. THE SINGLE FAMILY & 2-4 PRICE RANGES ARE POOR. WITH ONE FAMILY RANGE FROM $90,000 TO $175,000, WITH A PREDOMINANT OF $130,000. THE 2-4 FAMILY PRICE RANGE IS FROM $100,000 TO $250,000 WITH A PREDOMINANT OF $175,000. THE RENT RANGE IS TOO HIGH WITH A LOW RENT OF $650 AND A HIGH OF $1,200. THE SUBJECT SHOWS A LIST PRICE OF $260,000, BUT NO MLS LISTING IS AVAILABLE FOR THE SUBJECT.**

3. Is the appraiser's overall description of the site complete and accurate (zoning compliance, appraisal adverse conditions, apparent environmental hazards, etc.)?   ☐ Yes   ☒ No (If no, explain.)   **THE SUBJECT IS IN THE R-3 ZONE, WHICH ALLOWS FOR 1-3 FAMILY DWELLINGS WITH A MINIMUM LOT SIZE OF 50 X 100. THE SUBJECT IS OF LEGAL NON-CONFORMING USE AS IT PREDATES THE CURRENT LOT SIZE MINIMUMS. SHOULD THE DWELLING BE DESTROYED IN EXCESS OF 50%, A VARIANCE IS REQUIRED TO RE-BUILD. THE SUBJECT LOT IS NOTED AS 50 X 75 ON THE APPRAISAL. AS PER THE TAX MAP OF PATERSON, THE SUBJECT LOT IS 25 X 100.**

4. Is the appraiser's overall description of the improvements complete and accurate (property description, depreciation, condition, apparent environmental hazards, etc.)?   ☐ Yes   ☒ No (If no, explain.)   **THE SKETCH DOES NOT SHOW ANY DIMENSIONS OR ROOM LAYOUT. THE FIRST & SECOND FLOORS WERE MEASURED AT 775 SQ. FT. PER FLOOR. THE 3RD LEVEL COULD NOT BE MEASURED FROM THE EXTERIOR, AND NO INTERIOR ACCESS WAS AVAILABLE. HOWEVER, THE DWELLING COULD NOT BE 504 SQ. FT. ON THE 3RD FLOOR, AND IS ESTIMATED AT 17 X 20, OR 340 SQ. FT. THE DIMENSIONS PAGE NOTE WRONG DIMENSIONS, AND REFLECT THE DWELLING TO BE RECTANGULAR. THIS IS NOT THE CASE WITH A 3 FOOT EXTENSION TO THE SIDE, AND A 7.3 FOOT EXTENSION TO THE REAR. MEASUREMENTS ARE INCORRECT. IN ADDITION, INTERIOR ACCESS IS RECOMMENDED AS THE SUBJECT NOTES SUBSTANTIAL RECENT RENOVATIONS. THE FIRST FLOOR WAS ACCESSIBLE FOR A VIEW FROM THE EXTERIOR, AND THE TENANT WAS QUESTIONED. THERE WERE NO SIGNIFICANT RENOVATIONS DONE, AND NO PERMITS WERE TAKEN OUT WITH THE BUILDING DEPARTMENT.**

5. Are the design and appeal, quality of construction, and size of the subject property similar to others in this area?   ☒ Yes   ☐ No (If no, how is the subject different?)

6. Are the comparables used in the analysis truly comparable to the subject property, representative of the subject market, and were they the best ones available as of the effective date of this appraisal?   ☐ Yes   ☒ No (If no, explain and provide an adjustment grid with the appropriate comparables and adjustments on an addendum.)   **THE COMPS ARE ALL SUSPECT COMPARABLE SALES AND REFLECT FLIP SALES COMPLETED BY THE SAME REALTOR. THE PREVIOUS SALES OF EACH COMP WERE NOT NOTED. COMP 2 WAS PURCHASED ON 09/17/02 AFTER BEING ON THE MARKET FOR $149,900, AND WAS RE-SOLD THROUGH ANOTHER LISTING BOARD FOR THE SALES PRICE OF $290,000 ON 11/27/02. ALL COMPS ARE SIMILAR FLIP SALES AND ARE NOT CONSIDERED ACCURATE OR RELIABLE. THERE ARE OTHER SIMILAR SALES IN THE AREA THAT ARE GOOD COMPS. COMP 3 IS NOT WITHIN THE SUBJECT'S NEIGHBORHOOD.**

7. (a) Can the date of sale (contract date and/or closing), settlement date, sales price, and sales or financing concessions for the comparables be confirmed through the data source that the appraiser indicated?   ☒ Yes   ☐ No (If no, explain.)

(b) Were the comparables actual closed or settled sales as of the effective date of the original appraisal?   ☒ Yes   ☐ No (If no, explain.)   **ALL WERE CLOSED SALES AS OF THE EFFECTIVE DATE.**

Freddie Mac Form 1032 11/89   PAGE 1 of 3   Fannie Mae Form 2000 11/89
(1-4 Family Properties)   (1-4 Family Properties)

REEL APPRAISAL SERVICES


GOVERNMENT EXHIBIT
BB-34

## RESIDENTIAL APPRAISAL FIELD REVIEW REPORT   File # 252-1 SF402003974

8. Is the specific data for the comparables accurate (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?  [ ]Yes  [X]No  (If no, explain )   COMP 1 HAS NO MODERN KITCHEN OR BATH. COMP 2 NOTES 19 ROOMS, 13 BEDROOMS, AND 3 BATHS. IT DOES NOT NOTE ANY UPDATING.  COMP 3 IS VASTLY SUPERIOR IN LOCATION AND NOTES 14 ROOMS, 8 BEDROOMS, AND 3 BATHS. ALTHOUGH NOTED AS SUPERIOR IN CONDITION, IT DOES NOT NOTE ANY UPDATING. IT CONTAINS APPROX. 2,760 SQ. FT. OF LIVING AREA. IT IS ALSO VASTLY SUPERIOR IN LOCATION.

9. Are the individual adjustments to the comparables reasonable and supported (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?  [ ]Yes  [X]No  (If no, explain )   THE ADJUSTMENTS ARE NOT CONSIDERED AS NONE OF THE COMPS ARE GOOD SALES DUE TO THEIR BEING FLIPPED SALES AT INCREDIBLE INCREASES. THEY ARE NOT USABLE AS THEY DO NOT APPEAR TO BE ACCURATE MARKET SALES.

10. If the subject property is a small residential property (2-4) or a single-family investment property, are the comparable rental and expense data accurate and reasonable?  [ ]Yes  [X]No  [ ]N.A.  (If no, explain )  NONE OF THE RENTAL COMPS ARE WITHIN THE SUBJECT'S NEIGHBORHOOD AND ARE ALL POOR INDICATORS OF RENTAL VALUES IN THE AREA. BASED ON RENTAL COMPS IN THE AREA, THE FORECASTED RENTS FOR THE SUBJECT SHOULD BE NO MORE THAN $850 PER MONTH PER UNIT FOR THE FIRST AND SECOND FLOORS, AND NO MORE THAN $650 FOR THE 3RD FLOOR.  THE SUBJECT IS AFFECTED BY LOCAL RENT CONTROLS.

11. If the subject property is an individual unit in a condominium or PUD project, is the project description complete and accurate?  [ ]Yes  [ ]No  [X]N.A  (If no, explain )

12. Is the estimate of market value on subject property reasonable as of the effective date of the appraisal?  [ ]Yes  [X]No  (If no, provide an appropriate estimate of the market value for the subject property and state the assumptions (exterior inspection only), property description and conditions, etc.) that the reason is subject to )   BASED ON COMPARABLE SALES IN THE NEIGHBORHOOD, AND GIVEN THE ASSUMPTIONS THAT THE LIVING AREA IS AS MEASURED UPON REVIEW, WITH AN ESTIMATE FOR THE 3RD FLOOR, AND ASSUMING THAT THE SUBJECT IS IN AVERAGE OVERALL CONDITION, THE ESTIMATE OF VALUE OF $270,000 IS NOT SUPPORTABLE.
BASED ON THE ADDITIONAL COMPS UTILIZED, THE ESTIMATE OF VALUE FOR THE SUBJECT IS $115,000 AS OF THE EFFECTIVE DATE OF THE APPRAISAL.

13. Has there been a substantial change in the base economy in the area since the effective date of the appraisal?  [ ]Yes  [X]No  (If yes, explain )

14. If the subject property is a cooperative unit, the review appraiser must address the completeness and accuracy of the original appraiser's description and analysis of the cooperative project and specifically comment on the accuracy of (a) the number of shares attributable to the unit, (b) the pro-rata share of the blanket mortgage payments, and (c) the treatment of the monthly assessments of the comparable sales   N/A

I certify that, to the best of my knowledge and belief, the facts and data used herein are true and correct; that I personally inspected the exterior of the subject property, and the comparables used in the report; that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions; that I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved; that my compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report, and that my analyses, opinions, and conclusions were developed, and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

Signature of Review Appraiser  [signature: Chris R]   Date  MARCH 15, 2004
CHRIS REEL

**Client Use Only**

Review Underwriter's Comments

Signature of Review Underwriter _____   Date _____

# RESIDENTIAL APPRAISAL FIELD REVIEW REPORT

File no. 7256 LS1040206390

The purpose of this review is to determine the completeness and accuracy of the data in the appraisal report and to verify the accuracy of the market value estimate as to the effective date of the original appraisal. The appraisal review must address all factual, judgemental, and appraisal technique discrepancies. This field review is a spot-check on the original appraisal report as part of a mortgage quality review. It is not intended to be used as a new appraisal. (Please attach a copy of the original appraisal report to this report.)

Property Address 02 CLINTON STREET    City PATERSON    State NJ    Zip Code 07522

Legal Description BLOCK: A0045    LOT: 15.1    SMSA: 0875

Property Rights Appraised FEE SIMPLE    Client Reference Number LOAN #8631215

Effective Date of Original Appraisal and Field Review  APPRAISED: 03/05/03    REVIEWED: 04/01/04

Borrower MATIAS

Review Appraiser CHRIS REEL    Company Name REEL APPRAISAL SERVICES

Address  41 WOODMONT DRIVE, CHATHAM, NJ 07928 / LSI @ 700 CHERRINGTON PARKWAY, CORAOPOLIS, PA 15108

Telephone Number (973) 301-0123    Soc. Sec. or Tax ID Number 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

INSTRUCTIONS:  The review appraiser must personally inspect (by, at least, driving by) the exterior of the subject property and the comparables used in the analysis. Photographs are required for  the front of the comparables, the front of the subject, and the street scene of the subject property. Additional photographs are suggested if any adverse conditions that were not noted in the original appraisal are observed. (NOTE: The review appraiser is not required to inspect the exterior of the subject property. The review appraiser should verify the data in the original appraisal report, using the assessment records, the real estate broker, or any other data source that he or she considers to be reliable and reasonably available.) Based on the exterior inspection of the subject and the comparables, a thorough data review of the appraisal report, and a review of the relevant market data for the subject area, respond to the following questions. Enter an opinion about the appropriateness of the appraisal methods and techniques that were used, and indicate any areas of disagreement (giving reasons for the differences). Do not limit your responses to the space provided, attach an addendum if necessary.

**1. Provide a sales and listing history for the subject property for the last three years (if it is reasonably available from a data source that the review appraiser considers to be reliable.)**

| Conveyance Recordation Date | Sales Price | Asking Price | Mortgage Amount | Grantor / Grantee | Data Source |
|---|---|---|---|---|---|
| 03/25/03 | 290,000 | N/A | N/A | 253 E. 33RD STREET LLC / MATIAS | TAX OFFICE |
| | | | | | |
| | | | | | |
| | | | | | |

**2. Is the appraiser's overall description of the neighborhood complete and accurate ( location, general market conditions (i.e. place closings, crop failures, etc.), property values, demand / supply, marketing time, general appearance of properties, appeal to market, etc.)?** ☐ Yes ☒ No (If no, explain.)  THE NEIGHBORHOOD COMMENTS ARE INADEQUATE AND UNACCEPTABLE. THERE ARE SOME VACANT LOTS THROUGHOUT THE AREA WHICH ARE NOT NOTED. THERE IS A LARGE ELEMENTARY SCHOOL ACROSS THE STREET FROM THE SUBJECT, WITH ADJOINING PLAYGROUNDS, WHICH ARE NOT MENTIONED. THE 2-4 PRICE RANGES ARE POOR. PRICE RANGES ARE FROM $100,000 TO $250,000 WITH A PREDOMINANT OF $175,000. THE SINGLE FAMILY PRICE RANGE LOW READS "8" WHICH IS INCORRECT AND SHOULD READ $80,000.

**3. Is the appraiser's overall description of the site complete and accurate (zoning compliance, apparent adverse conditions, apparent environmental hazards, etc.)?** ☐ Yes ☒ No (If no, explain.)  THE SUBJECT IS IN THE R-3 ZONE, WHICH ALLOWS FOR 1-3 FAMILY DWELLINGS WITH A MINIMUM LOT SIZE OF 50 X 100. THE SUBJECT IS OF LEGAL NON-CONFORMING USE AS IT PREDATES THE CURRENT LOT SIZE MINIMUMS. SHOULD THE DWELLING BE DESTROYED IN EXCESS OF 50%, A VARIANCE IS REQUIRED TO RE-BUILD.

**4. Is the appraiser's overall description of the improvements complete and accurate (property description, depreciation, condition, apparent environmental hazards, etc.)?** ☒ Yes ☐ No (If no, explain.)  THE FLOOR PLAN NOTES THAT ALL 3 UNITS ARE THE SAME WITH ONLY ONE LEVEL DRAWN. NO INTERIOR ACCESS WAS MADE AVAILABLE TO THE REVIEWER, HOWEVER, 3 FAMILY DWELLINGS HAVE GENEARALLY THE SAME FLOOR PLAN WITH THE EXCEPTION OF THE TOP FLOOR WHRE THE FRONT ROOM EXTENDS OVER WHAT IS THE STAIRWAY ON FLOORS 1 & 2. THIS IS NOT NOTED, BUT COULD ALSO NOT BE VERIFIED. THE APPRAISAL NOTES THAT THE SUBJECT AND ALL COMPS ARE BUILT APPROXIMATELY 1940, THEY ARE AT LEAST 10 YEARS OLDER THAN NOTED BASED ON BUILDING TRENDS THROUGHOUT THE AREA, WITH LITTLE BUILDING GOING ON DURING THE YEARS OF WORLD WAR II. THIS HAS NO AFFECT ON VALUE.

**5. Are the design and appeal, quality of construction, and size of the subject property similar to others in this area?** ☒ Yes ☐ No (If no, how is the subject different?)

**6. Are the comparables used in the analysis truly comparable to the subject property, representative of the subject market, and were they the best ones available as of the effective date of this appraisal?** ☐ Yes ☒ No (If no, explain and provide an adjustments grid with the appropriate comparables and adjustments on an addendum.)  NONE OF THE COMPS ARE GOOD COMPS WITH COMPS 1&3 BEING NON-USABLE FLIP SALES WHICH WERE KNOWN TO THE APPRAISER, AS HE APPRAISED TWO OF THEM IN PREVIOUS APPRAISALS. THE OTHER COMP IS A NOT WITHIN THE SUBJECT'S NEIGHBORHOOD AND COULD NOT BE VERIFIED WITH THAT ADDRESS, BUT IS A SALE WHICH IS NOT A GOOD COMP. THERE WERE MARKET SALES IN THE IMMEDIATE NEIGHBORHOOD THAT SHOULD HAVE BEEN USED. THE FLIP SALES WERE NOT REPORTED BY THE APPRAISER, WHO KNEW OF THEM, AS HE APPRAISED AT LEAST ONE OF THE PROPERTIES.

**7. (a) Can the date of sale (contract date and/or closing settlement date), sales price, and sales or financing concessions for the comparables be confirmed through the data source that the appraiser indicated?** ☒ Yes ☐ No (If no, explain.)

**(b) Were the comparables actual closed or settled sales as of the effective date of the original appraisal?** ☒ Yes ☐ No (If no, explain.)  ALL WERE CLOSED SALES AS OF THE EFFECTIVE DATE.

GOVERNMENT EXHIBIT RB-35

8. Is the specific data for the comparables accurate (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?  ☐ Yes ☒ No
(If no, explain.) COMP 1 IS A FLIP SALE WHICH SOLD FOR SOLD FOR $125,000 ON 09/17/02 & WAS FLIPPED AND RE-SOLD THROUGH A DIFFERENT MLS BOARD. THE SAME APPRAISER AS THIS, USES THIS COMP ON OTHER APPRAISALS AND HAS COMP 2 NOTED AS RENOVATED AND HAVING 3,600 SQ. FT. OF LIVING AREA. THIS COMP IS NOT USABLE. COMP 3 IS ALSO UTILIZED BY THIS SAME APPRAISER, AND HAS IT FULLY RENOVATED, AND HAVING A LIVING AREA OF 3,600 SQ. FT. THIS IS ALSO A FLIP SALE BY THE SAME REALTOR AND APPRAISER WHICH WAS FRAUDULENTLY DONE. COMP 2 IS 330-332 12TH AVENUE AND IS VASTLY SUPERIOR IN LOCATION. COMP 2 IS 1.2 MILES AWAY AND IS UNDERSTATED ON THE APPRAISAL.

9. Are the individual adjustments to the comparables reasonable and supported (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?  ☐ Yes ☒ No (If no, explain.) COMPS 1 & 3 ARE NOT EVEN CONSIDERED DUE TO VAST DISCREPANICES AND FLIP SALE TRANSACTIONS. COMP 2 IS SUPERIOR IN CONDITION, LOCATION, LIVING AREA, ETC... ANDF IS ALSO NOT CONSIDERED AS A COMPARABLE SALE. DUE TO FRAUDULENT SALES AND ERRONEOUS INFORMATION. NONE OF THE ADJUSTMENTS FOR THE COMPS ARE EVEN APPLICABLE.

10. If the subject property is a small residential property, or a single-family investment property, are the comparable rental and expense data accurate and reasonable?  ☐ Yes ☒ No ☐ N/A (If no, explain.) RENTAL COMP 1 SHOWS NO RENTS AND IS NOTED AS A LEGAL ROOMING HOUSE WITH 15 ROOMS, 12 BEDROOMS, AND 3 BATHS.

11. If the subject property is an individual unit in a condominium or PUD project, is the project description complete and accurate?  ☐ Yes ☐ No ☒ N/A (If so, explain.)

12. Is the estimate of market value on subject property reasonable as of the effective date of the appraisal?  ☐ Yes ☒ No [ If no, provide an appropriate estimate of the market value for the subject property and state the assumptions (exterior inspection only, property description and condition, etc.) that the opinion is subject to. ] BASED ON COMPARABLE SALES IN THE NEIGHBORHOOD, AND GIVEN THE ASSUMPTIONS THAT THE SIZE, SURFACES, AND CONDITION OF THE SUBJECT IS AS REPORTED, AND A CONSISTENCY OF ADJUSTMENT, THE ESTIMATE OF VALUE OF $290,000 IS NOT SUPPORTABLE. BASED ON THE ADDITIONAL COMPS UTILIZED. THE ESTIMATE OF VALUE FOR THE SUBJECT IS $200,000 AS OF THE EFFECTIVE DATE OF THE APPRAISAL. SEE ATTACHED ADDENDUM.

13. Has there been a substantial change in the hase economy in the area since the effective date of the appraisal?  ☐ Yes ☒ No (If yes, explain.)

14. If the subject property is a cooperative unit, the review appraiser must address the completeness and accuracy of the original appraiser's description and analysis of the cooperative project and specifically comment on the accuracy of: (a) the number of shares attributable to the unit, (b) the pro-rata share of the blanket mortgage payments, and (c) the treatment of the monthly assessments of the comparable sales.  N/A

I certify that, to the best of my knowledge and belief the facts and data used herein are true and correct, that I personally inspected the exterior of the subject property and the comparables used in the report, that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions; that I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest in or bias with respect to the parties involved; that my compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report, and that my analyses, opinions, and conclusions were developed, and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

Signature of Review Appraiser
CHRIS REEL                                       Date APRIL 3, 2004
**Client Use Only**
Review Underwriter's Comments

Signature of Review Underwriter                          Date

# RESIDENTIAL APPRAISAL FIELD REVIEW REPORT

The purpose of this review is to determine the completeness and accuracy of the data in the appraisal report and to verify the accuracy of the market value estimate as of the effective date of the original appraisal. The appraisal review must address all factual, judgmental, and appraisal technique discrepancies. This field review is spot-check on the original appraisal report as part of a mortgage quality control. It is not intended to be used as a new appraisal. (Please attach a copy of the original appraisal report to this report.)

Property Address **33 STOUT STREET**     City **PATERSON**    State **NJ**    Zip Code **07522**

Legal Description **BLOCK: A0040   LOT: 4    SMSA: 0875**

Property Rights Appraised **FEE SIMPLE**     Client Reference Number **LOAN #9130639**

Effective Date of Original Appraisal and Field Review **APPRAISED: 12/13/03**    **REVIEWED: 05/23/05**

Borrower **MEDINA**

Review Appraiser **CHRIS REEL**          Company Name **REEL APPRAISAL SERVICES**

Address **41 WOODMONT DRIVE, CHATHAM, NEW JERSEY 07928**

Telephone Number **(973) 301-0123**      Soc. Sec. or Tax ID. Number **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**

INSTRUCTIONS The review appraiser must personally inspect (by, at least, driving by) the exterior of the subject property and the comparables. Photographs are required for the front of the comparables, the front of the subject, and the street scene of the subject property. Additional photographs are suggested if any adverse conditions that were not noted in the original appraisal are observed (NOTE: The review appraiser is not required to inspect the interior of the subject property. The review appraiser should verify the data in the original appraisal report, using this assessment records, the real estate broker, or any other data source that he or she considers to be reliable and reasonably available.) Based on the exterior inspection of the subject and the comparables, a thorough desk review of the appraisal report, and a review of the relevant market data for the subject area, respond to the following questions, form an opinion about the appropriateness of the appraisal methods and techniques that were used, and indicate any areas of disagreement (giving reasons for the differences). Do not limit your responses to the spaces provided, attach an addendum of necessary.

1. Provide a sales and finance history for the subject property for the last three years (if it is reasonably available from a data source that the review appraiser considers to be reliable).

| Conveyance Recordation Date | Sales Price | Asking Price | Mortgage Amount | Grantor / Grantee | Data Source |
|---|---|---|---|---|---|
| 08/19/2003 | $70,000 | N/A | N/A | 253 EAST 33RD STREET LLC/CAMPBELL | TAX OFFICE |
| 03/06/2004 | $295,000 | N/A | N/A | MEDINA/253 EAST 33RD STREET LLC | TAX OFFICE |
| | | | | | |

2. Is the appraiser's overall description of the neighborhood complete and accurate ( location, general market conditions (i.e. price closings, drop furlous, etc.), property values, demand / supply, marketing time, general appearance of properties, appeal to market, etc.)?   ☐ Yes   ☒ No   (If no, explain)   SINGLE FAMILY PRICE RANGE HAS A HIGH OF $250,000 AND A PREDOMINANT OF $175,000 WHICH ARE BOTH TOO HIGH. THE ONE FAMILY PREDOMINANT IS $125,000 AND THE HIGH IS $180,000. THE 2-4 FAMILY PRICE RANGE HAS A HIGH OF $350,000 AND A PREDOMINANT OF $290,000 WHICH ARE BOTH TOO HIGH. THE PREDOMINANT IS $160,000 AND THE HIGH IS $300,000. THE NEIGHBORHOOD COMMENTS ARE VAGUE AND GENERALIZED AND DO NOT NOTE ANY VACANT OR BOARDED DWELLINGS IN THE AREA, AS WELL AS THE NEW CONSTRUCTION WHICH WAS MENTIONED. THERE ARE ALSO WAREHOUSE BUSINESS WITHIN 1 BLOCK.

3. Is the appraiser's overall description of the site complete and accurate (zoning compliance, apparent adverse conditions, apparent environmental hazards, etc.)?   ☐ Yes   ☒ No (If no, explain)   ZONING IS INCORRECT. THE SUBJECT IS IN THE R-3 ZONE, ALLOWING 1-3 FAMILY DWELLINGS WITH A MINIMUM LOT SIZE OF 50 X 100. THE SUBJECT IS OF LEGAL NON-CONFORMING USE AS IT PREDATES THE CURRENT MINIMUM LOT SIZE. SHOULD THE DWELLING BE DESTROYED, A VARIANCE IS REQUIRED TO RE-BUILD. THERE IS A LIST PRICE NOTED FOR THE SUBJECT OF $290,000 THIS PROPERTY WAS NOT FOUND TO BE LISTED FOR THIS AMOUNT. SEE ATTACHED ADDENDUM. THE LOT SIZE IS INCORRECT AND SHOULD READ 25 X 47 X 30 X 60, AND IS IRREGULAR, AS PER THE TAX MAP OF PATERSON.

4. Is the appraiser's overall description of the improvements complete and accurate (property description, depreciation, condition, apparent environmental hazards, etc.)?   ☐ Yes   ☒ No (If no, explain)   SEE ATTACHED ADDENDUM

5. Are the design and appeal, quality of construction, and size of the subject property similar to others in this area?   ☒ Yes   ☐ No (If no, how is the subject different?)

6. Are the comparables used in the analysis truly comparable to the subject property, representative of the subject market, and were they the best ones available as of the effective date of this appraisal?   ☐ Yes   ☒ No (If no, explain and provide an adjustment grid with the appropriate comparables and adjustments on an addendum.)   COMPS 1&2 COULD NOT BE VERIFIED TO ANY DEGREE OF ACCURACY, AND NO RECORD CARDS WERE AVAILABLE. COMP 3 IS NOT SIMILAR IN LOCATION, AND IS NOT REPORTED CORRECTLY. THERE ARE BETTER AND CLOSER COMPARABLE SALES WITHIN THE IMMEDIATE NEIGHBORHOOD WHICH BETTER REFLECT THE SUBJECT PROPERTY.

7. (a) Can the date of sale (contract date and/or closing/settlement date), sales price, and sales or financing concessions for the comparables be confirmed through the data source than the appraiser indicated?   ☐ Yes   ☒ No (If no, explain.)   COMPS 1&2 COULD NOT BE VERIFIED AT THE TAX OFFICE. COMP 3 NOTES A SALES PRICE OF $227,000, AND NOT $300,000, AS PER THE MLS LISTING. THE CLOSED DATE FOR COMP 3 NOTES JANUARY 30, 2004, AND NOT 12/03, WHICH IS AFTER THE DATE OF INSPECTION ON THE APPRAISAL. IT WAS LISTED FOR $198,000, CONTRACTED ON 11/13/2003, AND CLOSED FOR $227,000 ON 01/30/2004, AS PER THE MLS LISTING.

(b) Were the comparables actual sales closed or settled sales as of the effective date of the original appraisal?   ☐ Yes   ☒ No (If no, explain.)   COMP 3 WAS NOT A CLOSED SALE AS OF THE DATE OF INSPECTION. COMPS 1&2 COULD NOT BE CONFIRMED THROUGH THE TAX OFFICE AND WERE NOT LISTED OR SOLD WITH THE MLS.

Freddie Mac Form 1032 11-59    1-4 Family Properties        PAGE 1 of 3        Fannie Mae Form 2000 11/89   1-4 Family Properties

**REEL APPRAISAL SERVICES**

GOVERNMENT EXHIBIT
BB-36

RESIDENTIAL APPRAISAL FIELD REVIEW REPORT   File No. 0774

(If so, explain)  AS COMPS 1&2 COULD NOT BE VERIFIED, NO DATA WAS AVAILABLE FOR THESE PROPERTIES. ALL ARE OLDER HOMES THAN NOTED. COMP 3 IS VASTLY SUPERIOR IN LOCATION AND THE MLS LISTING NOTES IT TO BE 1,800 SQUARE FEET. IT EXCEEDS THE 1 MILE DISTANCE PARAMETER. IT IS NOTED AS AN FHA SALE, AND NOT CONVENTIONAL.

9. Are the individual adjustments to the comparables reasonable and supported (i.e., location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?   [ ] Yes  [X] No  [ ] NA   (If so, explain)  COMP 3 SHOULD HAVE A LARGE ADJUSTMENT FOR SUPERIOR LOCATION. INFORMATION FOR COMPS 1&2 WERE NOT AVAILABLE AT THE TAX OFFICE.

10. If the subject property is a small residential property (2-then a single-family unit rental property) are the comparable rental and expense data accurate and reasonable?   [ ] Yes  [X] No  [ ] NA   (If so, explain)  THE RENTAL COMPARABLES DO NOT HAVE ACCURATE INFORMATION. RENTAL COMPS 2&3 DO NOT REFLECT ACCURATE INFORMATION, AS PER MLS REVIEW, AND DO NOT NOTE ANY RENTS FOR THESE 2 PROPERTIES. RENTAL COMP 1 DOES NOTE RENTS ON THE MLS LISTING. THE PROXIMITIES OF THESE COMPS ARE INACCURATE.

11. If the subject property is an individual unit in a condominium or PUD project, is the project description complete and accurate?   [ ] Yes  [ ] No  [X] NA   (If so, explain)

12. Is the estimate of market value on subject property reasonable as of the effective date of the appraisal?   [ ] Yes  [X] No   (If no, provide an appropriate estimate of the market value for the subject property and state the assumptions or basis (property inspection only, property description and condition, etc.) that the opinion is subject to.)  BASED ON THE ASSUMPTION THAT THE UNITS WERE RENOVATED ON THE INTERIOR, AND BASED ON ACCURATE INFORMATION AND BETTER COMPARABLE SALES, THE ESTIMATE OF VALUE OF $295,000 IS NOT SUPPORTABLE. THE ESTIMATE OF VALUE, AS OF DECEMBER 13, 2003 IS $181,000.

13. Has there been a substantial change in the base economy in the area since the effective date of the appraisal?   [ ] Yes  [X] No   (If yes, explain)

14. If the subject property is a cooperative unit, the review appraiser must address the completeness and accuracy of the original appraiser's description and analysis of the cooperative project and specifically comment on the accuracy of (a) the number of shares attributable to the unit, (b) the pro-rata share of the blanket mortgage payments, and (c) the treatment of the wealth assessments of the comparable sales   N A

I certify that: to the best of my knowledge and belief, the facts and data used herein are true and correct; that I personally inspected the exterior of the subject property and the comparables used in the report; that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions; that I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest in or bias with respect to the parties involved; that my compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report, and that my analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

Signature of Review Appraiser _____

CHRIS REEL                                    MAY 27, 2005

**Client Use Only**

Review Underwriter's Comments _____

Signature of Review Underwriter _____   Date _____

# RESIDENTIAL APPRAISAL FIELD REVIEW REPORT     File no. 7251 LSI#40206395

The purpose of this review is to report on the completeness and accuracy of the data in the appraisal report and to verify the accuracy of the market value estimate as to the effective date of the original appraisal. The appraisal review must address all factual, judgmental, and appraisal technique discrepancies. This field review is a spot-check on the original appraisal report as part of a mortgage quality review. It is not intended to be used as a new appraisal. (Please attach a copy of the original appraisal report to this report.)

Property Address **30 NORTH 6TH STREET**          City **PATERSON**          State **NJ**          Zip Code **07522**

Legal Description **BLOCK: A0058   LOT: 4   SMSA: 0875**

Property Rights Appraised **FEE SIMPLE**          Client Reference Number **LOAN #8631221**

Effective Date of Original Appraisal and Field Review   APPRAISED: **03/05/03**   REVIEWED: **03/15/04**

Borrower **LOUIS**

Review Appraiser **CHRIS REEL**          Company Name **REEL APPRAISAL SERVICES**

Address **41 WOODMONT DRIVE, CHATHAM, NJ 07928 / LSI @ 700 CHERRINGTON PARKWAY, CORAOPOLIS, PA 15108**

Telephone Number **(973) 301-0123**          Soc. Sec. or Tax ID. Number **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**

INSTRUCTIONS: The review appraiser must personally inspect (by, at least, driving by) the exterior of the subject property and the comparables used in the analysis. Photographs are required for : the front of the comparables, the front of the subject, and the street scene of the subject property. Additional photographs are suggested if any adverse conditions that were not noted in the original appraisal are observed. (NOTE: The review appraiser is not required to inspect the exterior of the subject property. The review appraiser should verify the data in the original appraisal report, using the assessment records, the real estate broker, or any other data source that he or she considers to be reliable and reasonably available.) Based on the exterior inspection of the subject and the comparables, a thorough desk review of the appraisal report, and a review of the relevant market data for the subject area, respond to the following questions. form an opinion about the appropriateness of the appraisal methods and techniques that were used, and indicate any areas of disagreement (giving reasons for the differences). Do not limit your responses to the space provided; attach an addendum if necessary.

1. Provide a sales and finance history for the subject property for the last three years (if it is reasonably available from a data source that the review appraiser considers to be reliable).

| Conveyance Recordation Date | Sales Price | Asking Price | Mortgage Amount | Grantor / Grantee | Data Source |
|---|---|---|---|---|---|
| 03/19/03 | 128,900 | 128,900 | N/A | SANTANA/DARCY | MLS/TAX OFFICE |
| 03/25/03 | 280,000 | N/A | N/A | DARCY/LOUIS | TAX OFFICE |

2. Is the appraiser's overall description of the neighborhood complete and accurate ( location, general market conditions (i.e. plant closings, crop failures, etc.), property values, demand / supply, marketing time, general appearance of properties, appeal to market, etc. ) ?   ☐ Yes   ☒ No   (If no, explain.)   THE NEIGHBORHOOD COMMENTS ARE INADEQUATE AND UNACCEPTABLE. THERE ARE SOPME VACANT LOTS THROUGHOUT THE AREA WHICH ARE NOT NOTED. THE SINGLE FAMILY & 2-4 PRICE RANGES ARE POOR. WITH ONE FAMILY RANGE FROM $90,000 TO $175,000, WITH A PREDOMINANT OF $130,000. THE 2-4 FAMILY PRICE RANGE IS FROM $100,000 TO $250,000 WITH A PREDOMINANT OF $175,000.

3. Is the appraiser's overall description of the site complete and accurate (zoning compliance, apparent adverse conditions, apparent environmental hazards, etc.)?   ☐ Yes   ☒ No   (If no, explain.)   THE SUBJECT IS IN THE R-2 ZONE, WHICH ALLOWS FOR 1&2 FAMILY DWELLINGS WITH A MINIMUM LOT SIZE OF 50 X 100. THE SUBJECT IS OF LEGAL NON-CONFORMING USE AS IT PREDATES THE CURRENT LOT SIZE MINIMUMS. SHOULD THE DWELLING BE DESTROYED IN EXCESS OF 50%, A VARIANCE IS REQUIRED TO RE-BUILD.

4. Is the appraiser's overall description of the improvements complete and accurate (property description, depreciation, condition, apparent environmental hazards, etc.)?   ☒ Yes   ☐ No   (If no, explain.)   THE SUBJECT IMPROVEMENTS SECTION APPEARS ADEQUATE BASED ON EXTERIOR INSPECTION AND THE SKETCH PROVIDED. THE SUBJECT IS LOT IS NOT LEVEL BUT STEEPLY SLOPING.

5. Are the design and appeal, quality of construction, and size of the subject property similar to others in this area?   ☒ Yes   ☐ No   (If no, how is the subject different?)

6. Are the comparables used in the analysis truly comparable to the subject property, representative of the subject market, and were they the best ones available as of the effective date of this appraisal?   ☐ Yes   ☒ No   (If no, explain and provide an adjustment grid with the appropriate comparables and adjustments on an addendum.)   NONE OF THE COMPS ARE WITHIN THE SUBJECT'S NEIGHBORHOOD, WITH ALL HAVING ERRONEOUS INFORMATION. THEY ARE NOT GOOD COMPS, WITH COMPS AVAILABLE WITHIN THE IMMEDIATE NEIGHBORHOOD.

7. (a) Can the date of sale (contract date and or closing/settlement date), sales price, and sales or financing concessions for the comparables be confirmed through the data source that the appraiser indicated?   ☒ Yes   ☐ No   (If no, explain.)

(b) Were the comparables actual closed or settled sales as of the effective date of the original appraisal?   ☒ Yes   ☐ No   (If no, explain.)   ALL WERE CLOSED SALES AS OF THE EFFECTIVE DATE.

GOVERNMENT EXHIBIT
BB-37

8. Is the specific data for the comparables accurate (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?  ☐ Yes  ☒ No
(If no, explain )  ALL COMPS ARE VASTLY SUPERIOR IN LOCATION AND ARE UNDERSTATED FOR PROXIMITY. COMP 1 HAS LIVING AREA OF APPROX. 2,600 SQ. FT., COMP 2 HAS A 2 CAR DETACHED GARAGE AND HAS A FINISHED AND HEATED 3RD LEVEL WITH 3 ROOMS AND A BATH, MAKING THE ROOM COUNT FOR THE SECOND UNIT 9 +4-2. IT HAS LIVING AREA OF APPROX. 2,600 SQ. FT.,  COMP 3  HAS LIVING AREA OF APPROX. 2,600 SQ. FT.,

9. Are the individual adjustments to the comparables reasonable and supported (time, location, design and appeal, quality of construction, age, condition, size, sales or financing concessions, etc.)?  ☐ Yes  ☒ No  (If no, explain )  ALL COMPS ARE VASTLY SUPERIOR IN LOCATION & LIVING AREA. THE ADJUSTMENTS WHICH ARE MADE ARE ADEQUATE BUT THE COMPS ARE NOT EVEN COMPARABLE TO THE SUBJECT AND DO NOT ADDRESS LOCATION OR LIVING AREA CORRECTLY.

10. If the subject property is a small residential property (2-4) or a single-family investment property, are the comparable rental and expense data accurate and reasonable?  ☐ Yes  ☒ No  ☐ N/A   (If no, explain.)  THE RENTAL COMPS ARE NOT ACCURATELY REFLECTED. RENTAL COMP 1 SHOWS THE SECOND UNIT RENTED AT $850/MONTH AND NO TENANT ON THE FIRST FLOOR. RENTAL 2 SHOWS NO RENTS. RENTAL 3 SHOWS A RENT OF $850 ON THE FIORTS FLOOR UNIT AND NO RENT ON THE SECOND FLOOR. THE FORECATSED RENTS FOR THE SUBJECT SHOULD BE NO MORE THAN $850 PER MONTH PER UNIT. THE SUBJECT IS AFFECTED BY LOCAL RENT CONTROLS.

11. If the subject property is an individual unit in a condominium or PUD project, is the project description complete and accurate?  ☐ Yes  ☐ No  ☒ N/A  (If no, explain.)

12. Is the estimate of market value on subject property reasonable as of the effective date of the appraisal?  ☐ Yes  ☒ No   (If no, provide an appropriate estimate of the market value for the subject and state the assumptions (exterior inspection only, property description and condition, etc.) that the opinion is subject to )  BASED ON COMPARABLE SALES IN THE NEIGHBORHOOD, AND GIVEN THE ASSUMPTIONS THAT THE SIZE, SURFACES, AND CONDITION OF THE SUBJECT IS AS REPORTED, AND A CONSISTENCY OF ADJUSTMENT, THE ESTIMATE OF VALUE OF $280,000 IS NOT SUPPORTABLE. BASED ON THE ADDITIONAL COMPS UTILIZED, THE ESTIMATE OF VALUE FOR THE SUBJECT IS $135,000 AS OF THE EFFECTIVE DATE OF THE APPRAISAL.
SEE ATTACHED ADDENDUM.

13. Has there been a substantial change in the base economy in the area since the effective date of the appraisal?  ☐ Yes  ☒ No   (If yes, explain )

14. If the subject property is a cooperative unit, the review appraiser must address the completeness and accuracy of the original appraiser's description and analysis of the cooperative project and specifically comment on the accuracy of: (a) the number of shares attributable to the unit, (b) the pro-rata share of the blanket mortgage payment, and (c) the treatment of the monthly assessments of the comparable sales.  N/A

I certify that, to the best of my knowledge and belief, the facts and data used herein are true and correct; that I personally inspected the exterior of the subject property and the comparables used in the report; that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions; that I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest in or bias with respect to the parties involved; that my compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report, and that my analyses, opinions, and conclusions were developed, and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

Signature of Review Appraiser _____  Date
CHRIS REEL                                               MARCH 15, 2004
Client Use Only
Review Underwriter's Comments

Signature of Review Underwriter _____  Date
                                                          NEW JERS

Freddie Mac Form 1032 11/89        PAGE 2 of 3        Fannie Mae Form 2000 11/89
1-4 Family Properties                                 1-4 Family Properties

# Jason Mitchell Documents

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 1396469-MF (1) |
| PERSON INTERVIEWED | : | Jason Mitchell |
| PLACE OF INTERVIEW | : | Newark US Attorney's Office |
| DATE OF INTERVIEW | : | December 12, 2008 |
| TIME OF INTERVIEW | : | 10:00 AM |
| INTERVIEWED BY | : | Mark Coyne<br>Assistant US Attorney |
| | | L. A. Presta<br>Postal Inspector |
| | | Joseph Czarnecki<br>IRS – CID |

Jason Mitchell, accompanied by his attorney John O'Reilly, was interviewed regarding his employment at·GMAC/RFC (RFC) and his relationship with representatives of US Mortgage (USM). Mitchell was working for American Security Bank in 1991 when RFC purchased the division he worked in. Mitchell was let go during a third round of lay-offs in November of 2007.

Mitchell stated USM President Michael McGrath was his primary contact. Mitchell dealt with the USM and their warehouse loans and Cathy Solomon dealt with the day to day purchasing of USM loans. In 2003, RFC identified certain geographic pockets in the country that had high loan delinquency. One of the locations identified was Paterson, NJ. At RFC Gwen O'Connor conducted the audit that lead to the inquiry. Mitchell said O'Connor identified 20-30 loans that she believed should be repurchased. Her findings were sent to Dorian Whealdon and Judy Dallman at RFC for review. Whealdon and Dallman review the loan to determine if there is something in the file that violates the repurchase agreement which would lead to USM being required to repurchase the loan.

At RFC there was an internal conference call, with the RFC warehouse group and the client conduit group responsible for the USM account whereby O'Connor discussed the fraud she had uncovered. She had spoken to borrowers and they described meeting at a diner where they met USM loan officer Jerry Carti and Mike Eliasof. O'Connor described the meetings as seminars to identify straw borrowers. O'Connor advised she was sending a letter to USM advising them of her findings regarding the loans in question and will give them an opportunity to answer the allegations. At a later date after the internal conference call, there was another conference call with the RFC warehouse group and the client conduit group that included Susan and Mike McGrath where they were offered an opportunity to answer and address the issues uncovered by O'Connor.

Mike McGrath followed the conference call up with an email to Deanna Keith, leader of the call, and cc'ed Mitchell and Solomon dated February 5, 2004, in which McGrath claims to

have appreciated the telephone conference and acknowledged that RFC was looking into 31 Paterson loans.  McGrath also added that 26 of the 31 loans were current.  Mitchell had notified McGrath prior to the conference call that a couple of loans that were in the warehouse that had not been sold to investors had issues.  Mitchell said McGrath paid off the loans with issues at that time.

Concerned about the allegations, Mitchell came to the USM office in Pine Brook and met with Mike McGrath. He recalled it being cold and rainy.  It could have been in March or April. Mitchell said the warehouse line of credit could have been up for renewal or he may have gone up to address the repurchase of the Paterson loans. Mitchell and McGrath took a ride to Paterson to look at some of the properties. They could not locate the first property and the second property looked beat up and not in the best condition.  They turned around and went back to the Pine Brook office. Mitchell said McGrath was being told by Carti that everything was fine.  Mitchell said Carti told McGrath the closing attorney William Colacino was a judge and there were no problems.  Mitchell said RFC thought there were issues with Eliasof and others and was concerned with what happened with the transactions.   Mitchell believed when they got back to the Pine Brook office McGrath was going to call Carti and Eliasof into his office and get to the bottom of what happened during the purchasing and financing of the properties in question.  Mitchell believes McGrath went back to Carti and Eliasof to resolve the problem.  He also indicated that McGrath refinanced the loans to Ameriquest.  Mitchell said it would be up to the Ameriquest underwriter to do the due diligence.  USM was the broker of the loan rather than the correspondent.

When the USM warehouse line of credit came up for renewal it was not immediately terminated.  Mitchell said he believed McGrath repaid the loans and met the RFC repurchase request.  USM was given the benefit of the doubt for "stepping up and taking care of their obligation."  Although the Paterson issue remained in the back of Mitchell's mind. When the time came up for renewal USM's usage was down.  RFC was not doing as much business with RFC. USM got a warehouse line of credit from Washington Mutual (WAMU). Mitchell became aware of the WAMU line after he informed McGrath that a loan would be hard to do. McGrath told him that he had a WAMU line.

Mitchell said warehouse lines usually wind down or expire August 31st of each year.  Mitchell said he noticed issues that lead him to the decision that he was not going to recommend renewing the USM warehouse line.  Mitchell said Mike McGrath hired Jim and Robert Walsh, formally of the troubled Walsh Securities, to run a new group or division of USM. McGrath also purchased Lend America a Long Island mortgage company which was owned by Michael Ashley.  Mitchell stated Lend America and Ashley had a bad reputation in the industry and had a "dirty history."  Mitchell said he had problems with lending to USM with the affiliation with Lend America.  Mitchell said McGrath told him that USM was becoming a wholesaler for Alt-A loans.  USM will be the investor initially when they purchase the loans. USM will then sell the loans to make money on the sale.

Mitchell explained when USM acts as a correspondent lender they are approved to do business with RFC and can underwrite loans using RFC guidelines to underwrite the loan. When USM acts as a loan broker they originate the loans taking the loan applications and RFC does the underwriting.

Mitchell was not familiar with the entity American Title & Settlement Services (AT).  He had no idea if Susan McGrath controlled or ran the operations at AT or if she was a part owner. Mitchell said RFC would have wanted to know if that was the case.  RFC would have wanted an explanation of the relationship when considering extending a warehouse line of credit. Mitchell stated the relationship would have been a bigger issue on the conduit side.  Mitchell

said in the warehouse line of credit agreement in the reps and warrants section it requires the parties to be in compliance of local, state, and federal laws. Mitchell was not aware of loan officers receiving commissions for referring title work to AT. Mitchell stated RFC would want the title company to be independent of the mortgage company as another set of controls to act as a safeguard. He would not be comfortable knowing the mortgage company owned the title company. Mitchell said it would have been a concern of his if he was aware USM owned AT. He would have wanted to know that and he would have run it through the RFC legal department and up the flag pole to get approval. RFC would want USM to explain the internal controls in place to ensure independence. Mitchell is not sure if loan officers receiving commissions from AT fees would have mattered to RFC.

In contrast, Mitchell noted another mortgage company client of his was considering acquiring or operating a title company and discussed the potential issues with doing so. The mortgage company did not acquire or form a related title company in the end but Mitchells point was that they brought it to his attention to discuss potential conflict or issues RFC might have.

Mitchell said if he had knowledge that USM and Equity Appraisals had a relationship he would have terminated the USM/RFC agreement. Mike McGrath told Mitchell William Ottaviano did appraisals for USM. If Ottaviano was not a licensed appraiser that would be something RFC would want to know. Appraisal fees going to USM would be an issue for the conduit group. Mitchell said appraisal companies and title companies should be independent of the mortgage companies.

Mitchell never heard of Dream On Enterprises. He said Janet Rinaldi sounded familiar. Mitchell said Jim McGrath ran the credit union business known as CU National. The credit union branch of USM maintained and serviced loans. The credit union sold the loans to Fannie Mae. A credit union member looking for a loan calls an 800 number thinking they are calling their credit union when in fact they are calling CU National.

Mitchell said Glenn Hedges was the CFO at USM. He provided the year end audit and the monthly financials to RFC. Mitchell said the name Frank Corallo sounded familiar. Mitchell did not know the name Karina Coelho or Andrew Liput. Rich Conforti was in charge of the USM secondary market. Solomon would have dealt with Conforti more than Mitchell. Mitchell would deal with Susan McGrath if he had an operational issue.

Around October 20, 2008, Mike McGrath contacted Mitchell and asked him to come to New Jersey to speak to him (McGrath) and his attorney Mike Critchley. McGrath said the government was putting pressure on Sue McGrath to make a plea deal and Mike McGrath said if she did not plea the government would be putting pressure on him. Mitchell told McGrath he was not able to come. Mike McGrath was concerned that RFC cancelled the line of credit because of the Paterson deals. Paterson was part of the reason along with the USM association with the Walsh's, and Lend America. Mitchell saw the Walsh's at USM prior to the Paterson issue. Mitchell said the association with Ashley and Lend America was the final straw.


L. A. Presta                                          12/15/08

U.S. Postal Inspector                                   Date

**GMAC** Residential Funding

GOVERNMENT
EXHIBIT
BB-14

April 15, 2004

Michael McGrath
U.S. Mortgage Corporation
19D Chapin Road
Pine Brook, NJ 07058

Re:      Repurchase Notification

Dear Mr. McGrath,

GMAC-Residential Funding Corporation (GMAC-RFC) has discovered Events of Default with
respect to those residential mortgage loans described below.

These mortgage transactions have fraud-for-profit scheme characteristics and common players
that include the same home sellers, appraisers (Ken Tersten or William Ottaviano), loan officer
(Jerry Carti), closing agent (William Colacino), and real estate agent (Michael Eliasof). The real
estate agent, Mr. Eliasof represents buyers with little, if any property management experience.
The loans are packaged under the Stated Income or No Income/No Asset documentation type.
The borrowers' credit reports reflect limited credit usage. The borrower's propensity to save and
ability to manage the higher level of debt is unknown. Mr. Eliasof received real estate
commissions as well as significant disbursements (i.e., as MGE, Inc) for alleged maintenance and
repairs on the subject properties. Based on interviews with borrowers and tenants, property
improvements represented in the appraisal reports had not been completed. Additionally, Mr.
Eliasof collects the rents and sends a check for the borrowers mortgage payments.

Our individual loan findings are as follows:


Elliott, Petra                RFC #8595487                US #01248
This loan transaction includes scheme characteristics and players that have been identified in a
fraud for profit scheme including the loan officer, Jerry Carti, real estate agent, Michael Eliasof,
and closing agent, William Colacino. The HUD-1 shows a significant disbursement to MGE
Investments for alleged "repairs and misc". MGE Investments is owned by Michael G. Eliasof,
the real estate agent in the transaction. Findings in this loan include misrepresentation of value -
churning to artificially inflate the value, cash to close not documented, and misrepresentation of
income.

• Churning / Appraisal-Value Misrepresentation. The appraisal report in the original loan file
  estimated the value of the subject property to be $273,000 as of 2/21/2003. A retrospective
  review appraisal dated 12/22/2003 obtained by GMAC-RFC revealed a value of $140,000 at
  the time of origination. Additionally, it was discovered that the subject property was
  churned, artificially inflating the value. It was listed for sale on 1/9/2003 for $139,900 and
  sold for $130,000 on 3/11/2003 (3 days prior to the subject transaction) from Perales to Darcy
  (seller on the subject transaction). On 3/14/2003 Darcy sold it to Elliot (buyer on subject
  transaction) for $280,000. GMAC-RFC's attached review appraisal provides further detail as
  it relates to the significant value deviation.

USM 000001667

- GMAC-RFC's review appraisal represents a 49% deviation from the original value resulting in a LTV of 166% which is excessive for this loan program.
- Cash to close not documented. The loan application in the original file represented the borrower had $56,250 cash at First Union Bank available to close the subject transaction. $47,950 was required to close. Required verification of sufficient borrower assets to close the transaction was not provided. GMAC-RFC is unable to determine if the minimum down payment of value was paid from the borrower's own cash as required.
- Misrepresentation of stated income. The loan application in the original file represents the borrowers base monthly income from Prospect Heights Care Center is $5650. GMAC-RFC's obtained information from Prospect Heights Care Center reveal the borrowers monthly income is approximately $1,410.
- Copies of checks for the mortgage payments obtained from our servicer reveal that the real estate agent, Michael Eliasof has made mortgage payments for the subject loan.
- Based on the foregoing, GMAC-RFC is unable to determine the borrower's ability to repay as it cannot rely on the accuracy of the information in the original loan file.


**Elliott, Petra                        RFC #8376547                        US #MAIN00758**
This loan transaction includes scheme characteristics and players that have been identified in a fraud for profit scheme including the home seller, Norman Barna, loan officer, Jerry Carti, appraiser, Ken Tersten (unlicensed), real estate agent, Michael Eliasof, and closing agent, William Colacino. In these cases, the HUD-1 shows a significant disbursement to MGE Investments that is owned by Michael G. Eliasof. Findings in this loan include misrepresentation of appraised value, evidence of property churning to artificially inflate the property value, use of an unlicensed appraiser, and occupancy and income misrepresentation (refer to detail in RFC #8595487).

- Churning / Appraisal-Value Misrepresentation. The appraisal report in the original loan file estimated the value of the subject property to be $264,000 as of 12/11/2002. A review appraisal dated 1/15/2004 obtained by GMAC-RFC revealed a value of $155,000 at the time of origination. Additionally, it was discovered that the subject value was artificially inflated as a result of churning.
- The subject property was sold on 10/29/2003 from HUD to Obeji for $126,840; and on 11/19/2002 from Obeji to Barna (seller on the subject transaction) for $160,000; and on 12/31/2002 from Barna to Elliott (buyer on subject transaction) for $264,000. GMAC-RFC's review appraisal is attached providing further detail.
- GMAC-RFC's review appraisal represents a 42% deviation from the original value resulting in a LTV of 162% which is excessive for this loan program.
- Unlicensed Appraiser. Ken Tersten was represented as the appraiser that completed the appraisal in the original loan file and the appraisal did not include a supervisory appraiser signature. GMAC-RFC discovered that Mr. Tersten is a trainee appraiser. A letter from the State of NJ Appraiser License Board revealed that Mr. Tersten is not licensed. Appraisals performed by a trainee require the signature of a licensed appraiser.
- Occupancy. The loan application in the original loan file represented that the purpose of the subject transaction was a purchase of the borrower's primary residence. The hazard insurance binder in the original loan file indicates "tenant" occupied. Additionally, the subject property is listed as a rental property on the original loan application in GMAC-RFC loan #8595487 that closed 3/14/2003, 2 months after the subject transaction.

McKenzie, Valerie          RFC #8376553          US #MAIN01011

This loan transaction includes scheme characteristics and players that have been identified in a fraud for profit scheme including the seller, 253 E 33rd St LLC (Frederick Ugwu), loan officer, Jerry Carti, appraiser, Ken Tersten (unlicensed), real estate agent, Michael Eliasof, and closing agent, William Colacino. Findings in this loan include transaction and appraised value misrepresentation, evidence of property churning to artificially inflate the property value, use of an unlicensed appraiser, and occupancy and income misrepresentation. In these cases, the HUD-1 shows a significant disbursement to MGE Investments that is owned by Michael G. Eliasof.

- Income Misrepresentation. The loan application in the original loan file represents that the borrower is employed by Lakeland Healthcare as a nurse earning $6575 monthly base income. GMAC-RFC obtained a reverification of employment from Lakeland Health Care Center indicating the borrower's monthly income is $1522.52. Based on the foregoing, the borrower's ability to repay the subject loan is not established.
- Cash to close not documented. The loan application in the original file represented the borrower had $56,450 cash at PNC available to close the subject transaction. At least $33,000 was required to close. Required verification of borrower assets to close the transaction was not provided. Additionally, PNC verified that the account number represented on the original loan application is not a valid PNC account number and that the borrower did not have a depository relationship with PNC.
- GMAC-RFC interviewed the borrower on 2/4/2004 where she revealed that she did not make the $33,000 earnest money deposit as indicated on the HUD-1 in the original loan file. She indicated that she had to work two jobs to support herself and that Mr. Michael Eliasof loaned her the earnest money and that she pays him back on a monthly basis. Further she indicated that Mr. Eliasof collects the rents, brings her the proceeds, a portion of which he keeps as payment against the $33,000 earnest money "loan", and she writes the checks to Homecomings for the mortgage payment. Mr. Eliasof is the real estate agent in the subject transaction.
- Based on the foregoing, GMAC-RFC is unable to determine if the minimum down payment of value was paid from the borrower's own cash as required.
- Churning / Condition of Subject Property. The subject property value was artificially inflated as a result of churning. It transferred from FNMA to 253 E 33rd St LLC on 12/17/2002 for $120,000; then from 253 E 33rd St LLC to McKenzie (borrower on subject transaction) on 12/30/2002 for $220,000.
- The original appraisal was completed subject to repairs. An Escrow Holdback Agreement for $40,000 was found in the original loan file. In an interview with a tenant of the subject property on 2/4/2004, she indicated that her landlord is "Mike" Eliasof (real estate agent in the subject transaction). She indicated that her total rent is a little over $1000 a month, but that the unit is a Section 8 property so the rent is paid directly to the landlord. Further, she said he comes monthly to collect rents over the Section 8 allotment. She also indicated that there had been no renovations to her unit even though she has repeatedly attempted to get Mr. Eliasof to repair the leaking ceiling in the bath and the bedroom ceiling and she is afraid it will fall. She also indicated that there have been numerous electrical problems in the building (please refer to interview memo attached).
- Unlicensed Appraiser. Kenneth Tersten completed the appraisal in the original loan file and the appraisal did not include a supervisory appraiser signature. GMAC-RFC discovered that Mr. Tersten is a trainee appraiser. The State of NJ Appraiser License Board revealed that Mr. Tersten is not licensed. Appraisals performed by a trainee require the signature of a licensed appraiser.

USM 000001669

4

- Occupancy. One of the loan applications in the original loan file represents that the borrower was purchasing the subject property as her primary residence and another represents it as a non-owner occupied property. The original loan file also has a letter with the borrowers signature explaining why she will be occupying the subject property. GMAC-RFC purchased the subject loan as a non-owner occupied property.
- Based on foregoing, GMAC-RFC is unable to rely on the accuracy of the information in the original loan file.

**Mitchell, George          RFC #8266161          US #MAIN00734**
This loan transaction includes scheme characteristics and players that have been identified in a fraud for profit scheme including the seller, Norman Barna, loan officer, Jerry Carti, appraiser, Ken Tersten (unlicensed), real estate agent, Michael Eliasof, and closing agent, William Colacino. Findings in this loan include transaction misrepresentation, evidence of property churning to artificially inflate the property value, and use of an unlicensed appraiser. In these cases, the HUD-1 shows a significant disbursement to MGE Investments that is owned by Michael G. Eliasof.

- Transaction Misrepresentation. The loan application in the original loan file represents the subject transaction is a purchase of a non-owner occupied property for the borrowers investment purposes. GMAC-RFC spoke to one of the tenants in the subject property, Kerry Rumph at 973-925-9341 on 1/29/2004 at 2:55 pm, who indicated her landlord was "Mike" Eliasof (real estate agent in the subject transaction) and that she was paying rents to him. Additionally, the lockbox shows Mr. Eliasof is making the payments.
- Unlicensed Appraiser. Ken Tersten was represented as the appraiser that completed the appraisal in the original loan file and the appraisal did not include a supervisory appraiser signature. GMAC-RFC discovered that Mr. Tersten is a trainee appraiser. A letter from the State of NJ Appraiser License Board revealed that Mr. Tersten is not licensed. Appraisals performed by a trainee require the signature of a licensed appraiser.

**Sterling, Donna          RFC #8535919          US #MAIN01072**
This loan transaction includes scheme characteristics and players that have been identified in a fraud for profit scheme including the seller, Frederick Ugwa, loan officer, Jerry Carti, appraiser, William Ottaviano, real estate agent, Michael Eliasof, and closing agent, William Colacino. The HUD-1 shows a significant disbursement to MGE Investments that is owned by Michael G. Eliasof. Findings in this loan include evidence of questionable property condition, churning, income misrepresentation, and undisclosed debts.
(stated income program - performing)

- Income Misrepresentation. The loan application in the original loan file represents the borrower is employed as a Staff Coord for Valley Healthcare earning monthly income of $5125. GMAC-RFC obtained a reverification of employment/income from Valley Healthcare revealing the borrower's monthly income is $2487.33.
- Lock box evidences Michael G. Eliasof makes the mortgage payments.
- Undisclosed debt. GMAC-RFC obtained a credit report that revealed that borrower had additional ownership in property and mortgage debt that was not disclosed on the original loan application. The undisclosed mortgages are with Chase opened 9/2002 for $201,376 with a monthly payment of $2352 and American General opened 1/31/2003 for $149,999 with a monthly payment of $1095 secured by 199 N 7th Street.

- Based on the foregoing, the borrower's ability to repay has not been established.
- Condition of Subject Property / Evidence of Churning. The appraisal report in the original loan file estimated the value of the subject property to be $198,000 as of 2/10/2003. A retrospective review appraisal dated 12/17/2003 obtained by GMAC-RFC revealed a value of $160,000 at the time of origination. Additionally, the original appraiser stated the property owner has "renovated the property including but not limited to new kitchen and baths, new siding, new flooring, and professional painting throughout.
- The review appraiser gained access to the interior of the front unit and noted that it did not appear renovated at inspection. It had not been updated, and did not have a new kitchen, no new painting, and was not in good condition. The old bath had apparently leaked at some point in time, with the front hallway having a portion of the ceiling down below the bath. See attached review appraisal for further detail.
- The subject property was sold on 9/5/2002 from Contimortgage to Ugwu for $41,900 (seller on the subject transaction) and on 2/21/2003 from Frederick Ugwu to Sterling (buyer on subject transaction) for $190,000.
- Based on the foregoing, GMAC-RFC is unable to rely on the accuracy of the condition or value of the subject property as represented in the original file appraisal report.
- GMAC-RFC's review appraisal represents a 20% deviation from the original value resulting in a LTV of 101% which is excessive for this loan program.

**Sterling, Donna**            **RFC #8266163**            **US #MAIN00744**

This loan transaction includes scheme characteristics and players that have been identified in a fraud for profit scheme including the seller, Norman Barna, loan officer, Jerry Carti, appraiser, Ken Tersten (unlicensed), real estate agent, Michael Eliasof, and closing agent, William Colacino. The HUD-1 shows a significant disbursement to MGE Investments that is owned by Michael G. Eliasof. Findings in this loan include evidence of property churning to artificially inflate the property value, and transaction misrepresentation.
(NINA program - performing - Spouse: Kenneth Sterling).

- The original appraisal report noted improvements were made to the subject property. There is no evidence of any repairs/improvements to the property. There were no permits noted through the building department.
- Unlicensed Appraiser. Kenneth Tersten completed the appraisal in the original loan file and the appraisal did not include a supervisory appraiser signature. GMAC-RFC discovered that Mr. Tersten is a trainee appraiser. The State of NJ Appraiser License Board revealed that Mr. Tersten is not licensed. Appraisals performed by a trainee require the signature of a licensed appraiser.
- Based on GMAC-RFC's findings relative to the borrowers income, the borrower's ability to repay cannot be established (see RFC #8535919)

**Sterling, Kenneth**            **RFC #8490139**            **US #MAIN01064**

This loan transaction includes scheme characteristics and players that have been identified in a fraud for profit scheme including the loan seller, 253 E 33rd Street, LLC (Frederick Ugwu), loan officer, Jerry Carti, appraiser, William Ottaviano, real estate agent, Michael Eliasof, and closing agent, William Colacino. The HUD-1 shows a significant disbursement to MGE Investments that is owned by Michael G. Eliasof. Findings in this loan include evidence of property churning to artificially inflate the property value, use of an unlicensed appraiser, and transaction misrepresentation. (Spouse: Donna Sterling).

- Cash to close not documented. The hand written loan application in the original file represented the borrower had $62,375 cash at New York Community Bank available to close the subject transaction. At least $42,000 was required to close. Verification of borrower assets to close the transaction was not provided.
- Undisclosed debt. GMAC-RFC obtained a credit report that revealed that borrower had additional ownership in property and mortgage debt that was not disclosed on the original loan application. The undisclosed mortgages are with Countrywide opened 9/5/2002 for $207,000 with a monthly payment of $2366 secured by 68 N 8th Street and American General opened 1/31/2003 for $149,999 with a monthly payment of $1095 secured by 199 N 7th Street.
- Income Misrepresentation. The original loan file represented that the borrower was a Handler for Marcel Paper Mill Inc earning monthly income of $6,250. GMAC-RFC obtained a reverification of employment/income from Marcel Paper Mill, Inc revealing the borrower's monthly income is $2243.06.
- Lock box evidences Michael G. Eliasof makes the mortgage payments.
- Based on the foregoing, the borrower's ability to repay has not been established.
- Churning / Appraisal -Value Misrepresentation. The most recent appraisal report in the original loan file estimated the value of the subject property to be $285,000 as of 4/1/2003. A retrospective review appraisal dated 12/22/2003 obtained by GMAC-RFC revealed a value of $135,000 at the time of origination.
- The subject property was sold on 12/24/2002 from Campbell to 253 E. 33rd Street, LLC for $75,000 (seller on the subject transaction) and on 2/13/2003 from 253 E. 33rd Street, LLC to Sterling (buyer on subject transaction) for $280,000. The subject value was artificially inflated as a result of churning. GMAC-RFC's review appraisal is attached providing further detail.
- GMAC-RFC's review appraisal represents a 53% deviation from the original value resulting in a LTV of 176% which is excessive for this loan program.

**Williams, Carolyn**          **RFC #8153741**          **US #0109818**
This loan transaction includes scheme characteristics and players that have been identified in a fraud for profit scheme including the seller, Norman Barna, loan officer, Jerry Carti, real estate agent, Michael Eliasof, and closing agent, William Colacino. The HUD-1 shows a significant disbursement to MGE Investments that is owned by Michael G. Eliasof.

- Occupancy Misrepresentation. The loan application in the original loan file represented that the purpose of the subject transaction was a purchase of the borrower's primary residence. The subject loan closed 9/30/2002.
- The hazard insurance binder in the original loan file indicates the subject as "tenant" occupied.
- A subsequent loan for this borrower, secured by 138 Highland Street closed 1/13/2003 and sold to GMAC-RFC by US Mortgage on 1/13/2003, was also represented as the borrower's primary residence (RFC #8338575). The borrower's primary residence on the original loan application for both loans is shown as 218 Prospect Avenue, 2A, Hackensack, NJ.
- Lock box evidences Michael G. Eliasof has made mortgage payments.
- Churning - Appraisal concerns. The subject property sold at foreclosure sale on 12/10/2001 to Fairbanks Capital who sold it to Norman Barna on 5/21/2002 for $100,000 who in turn sold it to Carolyn Williams for $300,000 on 9/30/2002. GMAC-RFC obtained Lexis searches

USM 000001672

that show comparable 1 and 2 were also flipped properties involving UG Properties (Frederick Ugwu). Comparable 2 was also listed by Michael Eliasof, the same real estate agent on the subject transaction.

- The prior sales on the subject and comparable properties were not disclosed on the original appraisal report as required.
- The HUD-1 in the original loan file shows a $31,000 disbursement to MGE Investments for alleged repairs to roof and misc.
- On 1/27/2004 GMAC-RFC's auditor interviewed one of the tenants AJ Tavarez at 973-956-1804 residing at the subject property, 157 Temple. She indicated that her landlord is Michael Eliasof and that he is the individual to whom she pays the rent. She indicated that she has taken him to court numerous times in the last year due to the poor condition of the subject property. She further indicated that she has no knowledge of an individual by the name of Carolyn Williams (the owner of the subject property).
- Based on the foregoing, GMAC-RFC is unable to rely on the accuracy of the information in the original loan file.

**Williams, Carolyn**          **RFC #8338575**          **US #MAIN00818**

This loan transaction includes scheme characteristics and players that have been identified in a fraud for profit scheme including the seller, Norman Barna, loan officer, Jerry Carti, Ken Tersten, (Unlicensed Appraiser), real estate agent, Michael Eliasof, and closing agent, William Colacino. The HUD-1 shows a significant disbursement to MGE Investments that is owned by Michael G. Eliasof.

- Churning / Appraisal -Value Misrepresentation. The appraisal report in the original loan file estimated the value of the subject property to be $220,000 as of 1/14/2003. A retrospective review appraisal dated 12/22/2003 obtained by GMAC-RFC revealed a value of $140,000 at the time of origination.
- The original appraiser reported that the subject property had sold for $110,000 on 10/2001. GMAC-RFC's review appraiser found this to be inaccurate. According to public records, the subject property was listed with MLS for $149,900, reduced to a last list price of $129,000, and sold for $110,000 on 10/23/2002 from Laterra to Barna and then from Norman Barna to Carolyn Williams for $280,000.
- GMAC-RFC's review appraisal represents a 37% deviation from the original value resulting in a LTV of 142% which is excessive for this loan program. The subject property value was artificially inflated as a result of churning. The review appraisal is attached providing further detail.
- Unlicensed Appraiser. Kenneth Tersten completed the appraisal in the original loan file and the appraisal did not include a supervisory appraiser signature. GMAC-RFC discovered that Mr. Tersten is a trainee appraiser. The State of NJ Appraiser License Board revealed that Mr. Tersten is not licensed. Appraisals performed by a trainee require the signature of a licensed appraiser.
- Lock box evidences Michael G. Eliasof has made mortgage payments (check from Paterson Management, LLC, signed by Michael Eliasof).
- Based on the foregoing, GMAC-RFC is unable to rely on the accuracy of the information in the original loan file.

USM 000001673

## Resolution

Due to the material impact these findings have on the quality of these loans, GMAC-RFC will be requiring repurchase. However, due to the number of loans involved and the sensitivity of this matter, and in consideration of our long-term relationship, we would like the opportunity to discuss them with you first. Please note, additional loans are under review and we will notify you when those audits are completed.

I will be calling you to arrange a time that is convenient for you.

Sincerely,

Cathy Solomon
Sales Director
GMAC-RFC

Cc:    Susan McGrath
       Jason Mitchell
       Deanna Keith
       Judy Dallman

USM 000001674

**GMAC** Residential Funding

GOVERNMENT
EXHIBIT
BB-23

June 16, 2004

Michael McGrath
U.S. Mortgage Corporation
19D Chapin Road
Pine Brook, NJ  07058

Re:      Repurchase Notification

Dear Mr. McGrath,

GMAC-Residential Funding Corporation (GMAC-RFC) has discovered Events of Default with
respect to those residential mortgage loans described below.

These mortgage transactions have fraud-for-profit scheme characteristics and common players
that include the same home sellers, appraisers (Ken Tersten or William Ottaviano), loan officer
(Jerry Carti), closing agent (William Colacino), and real estate agent (Michael Eliasof).  The real
estate agent, Mr. Eliasof represents buyers with little, if any property management experience.
The loans are packaged under the Stated Income or No Income/No Asset documentation type.

The borrowers' credit reports reflect limited credit usage.  The borrower's propensity to save and
ability to manage the higher level of debt is unknown.  Mr. Eliasof received real estate
commissions as well as significant disbursements (i.e., as MGE, Inc) for alleged maintenance and
repairs on the subject properties.  Based on interviews with borrowers and tenants, property
improvements represented in the appraisal reports had not been completed.  Additionally, in
many of the transactions, Mr. Eliasof collects the rents and sends a check for the borrowers
mortgage payments.

In addition to the foregoing, individual loan findings are as follows:

Chambers, Sharon              RFC #8452379              US #109922
- Transaction misrepresentation. (See above).
- Churning - Appraisal-Value Misrepresentation. The appraisal report in the original loan file
  estimated the value of the subject property to be $349,000 as of 11/8/2002.  A retrospective
  review appraisal dated 4/7/2004 obtained by GMAC-RFC revealed a value of $210,000 at the
  time of origination.  Additionally, it was discovered that the subject property was churned,
  artificially inflating the value.  The attached review appraisal provides further detail as it
  relates to the significant value deviation.  GMAC-RFC's review appraisal represents a 40%
  deviation from the original value resulting in a LTV of 150% which is excessive for this loan
  program.
- Occupancy misrepresentation. The loan application in the original loan file represents that the
  purpose of the subject transaction was a purchase of the borrower's primary residence.
  GMAC obtained a Haines search revealing the borrower continues to occupy her departure
  residence listed on the original loan application, 480 E. 33rd Street, Paterson, NJ.
  Additionally, in an interview with the borrower, she indicated she had never intended to
  occupy the subject property as her primary residence.  She indicated that the subject is a
  Section 8 rental and she resides at 480 E. 33rd Street with her mother, Maureen Wilson.



**Cuebas, Ricardo**         **RFC #8490131**         **US #MAIN00997**
- Transaction Misrepresentation (see above).
- Churning - Appraisal-Value Misrepresentation. The appraisal report in the original loan file estimated the value of the subject property to be $262,000 as of 2/7/2003. A retrospective review appraisal dated 4/16/2004 obtained by GMAC-RFC revealed a value of $152,000 at the time of origination. Additionally, it was discovered that the subject property was churned, artificially inflating the value. The attached review appraisal provides further detail as it relates to the churning and significant value deviation. GMAC-RFC's review appraisal represents a 42% deviation from the original value resulting in a LTV of 154% which is excessive for this loan program.
- Occupancy misrepresentation. The loan application in the original loan file represents that the purpose of the subject transaction was a purchase of the borrower's primary residence. GMAC-RFC obtained a Haines search revealing the borrower continues to occupy his departure residence listed on the original loan application, 402 Market Street, Paterson, NJ and reports a Jose Vargas is listed at the subject property for the past 40 months.

**Gonzalez, Soraya**         **RFC #8266167**         **US #MAIN00872**
- Transaction Misrepresentation (see above).
- Unlicensed Appraiser. Ken Tersten was represented as the appraiser that completed the appraisal in the original loan file and the appraisal did not include a supervisory appraiser signature. GMAC-RFC discovered that Mr. Tersten is a trainee appraiser. A letter from the State of NJ Appraiser License Board revealed that Mr. Tersten is not licensed. Appraisals performed by a trainee require the signature of a licensed appraiser.
- Churning - Artificially inflated value. The appraisal in the original loan file estimates the value of the subject property to be $270,000 as of 10/16/2002. GMAC-RFC research revealed the subject loan sold at Sheriff's sale on 2/17/2000 for $73,100 to Lantiqua. Then Lantiqua sold it to Alba Spraus on 7/24/2000 for $155,000, which then sold it to Gonzalez on 11/14/2002 for $270,000. Additionally, comparable 3 is a flipped property involving Frederick Ugwu as he acquired it at foreclosure for $68,981 and sold it for $280,000 on 7/12/2002 to Sybil McClean. This particular comparable has been used in multiple appraisals performed by Mr. Tersten in this scheme where the value is artificially inflated through the use of flipped properties where the value is not supported. Comparable 1 is also a flipped transaction as it sold of 4/10/2002 for $193,000 and again on 8/2002 for $270,000.
- Based on the foregoing, GMAC-RFC is unable to rely on the accuracy of the information in the original loan file.

**Henry, Rosalie**         **RFC #8490137**         **US #MAIN01058**
- Transaction Misrepresentation (see above).
- Churning - Appraisal / Value Misrepresentation. The appraisal report in the original loan file estimated the value of the subject property to be $270,000 as of 4/1/2003. A retrospective review appraisal dated 3/15/2004 obtained by GMAC-RFC revealed a value of $115,000 at the time of origination. Additionally, it was discovered that the subject and comparable properties were churned, artificially inflating the value. The attached review appraisal provides further detail as it relates to the churning and significant value deviation. GMAC-RFC's review appraisal represents a 58% deviation from the original value resulting in a LTV of 192% which is excessive for this loan program.
- Misrepresentation of stated income. The loan application in the original file represents the borrowers base monthly income from Accredited Health Service is $8750.25. GMAC-RFC obtained information from Accredited Health Service that revealed the borrowers monthly

income is $836. Based on the foregoing, GMAC-RFC is unable to determine the borrower's ability to repay, as it cannot rely on the accuracy of the information in the original loan file.

- Cash to close not documented. The loan application in the original file represented the borrower had $68,500.50 cash at Valley National Bank available to close the subject transaction. At least $43,000 was required to close. Required verification of borrower assets to close the transaction was not provided. GMAC-RFC is unable to determine if the minimum down payment of value was paid from the borrower's own cash as required.

**Louis, Sonja**                    **RFC #8631221**                    **US #MAIN01295**
- Transaction Misrepresentation (see above).
- Churning - Appraisal / Value Misrepresentation. The appraisal report in the original loan file estimated the value of the subject property to be $280,000 as of 3/5/2003. A retrospective review appraisal dated 3/15/2004 obtained by GMAC-RFC revealed a value of $135,000 at the time of origination. Additionally, it was discovered that the subject and comparable properties were churned, artificially inflating the value. The attached review appraisal provides further detail as it relates to the churning and significant value deviation.
- GMAC-RFC's review appraisal represents a 52% deviation from the original value resulting in a LTV of 177% which is excessive for this loan program.

**Mason, Jennetta**                    **RFC #8219341**                    **US #MAIN00828**
- Transaction Misrepresentation (see above).
- Occupancy Misrepresentation. The loan application in the original loan file represented that the purpose of the subject transaction was a rate/term refinance of the borrower's primary residence. The hazard insurance binder in the original loan file indicates "tenant" occupied. Additionally, the collection notes indicate the subject property is a rental property.
- Churning. The subject property was a prior foreclosure which sold for $40,000 to 253 E. 33rd (Frederick Ugwu) on 11/21/2001 then sold to the borrower for $195,000 on 4/24/2002. There is insufficient commentary in the appraisal report to support this 387% increase in value. The prior sale of the subject involved Michael Eliasof as the realtor and Frederick Ugwu as the seller.

**Mason, Jennetta**                    **RFC #8376533**                    **US #109781**
- Transaction Misrepresentation (see above).
- Unlicensed Appraiser. Ken Tersten was represented as the appraiser that completed the appraisal in the original loan file and the appraisal did not include a supervisory appraiser signature. GMAC-RFC discovered that Mr. Tersten is a trainee appraiser. A letter from the State of NJ Appraiser License Board revealed that Mr. Tersten is not licensed. Appraisals performed by a trainee require the signature of a licensed appraiser.
- Churning - Artificially inflated value. The subject property value appears to have been artificially inflated. It sold for $38,000 on 2/14/2000 at foreclosure, then for $57,000 on 3/29/2000 from Doller Realty to Palmeieri Assoc, Inc and it sold from Palmeiri to Fred Ugwu on 10/25/2002 for $12,000 prior to the sale to the borrower for $270,000 on 11/21/2002 (less than 1 month later). Additionally, comparable 3 at 11 Oxford is also a flipped sale and has been used in multiple appraisals by Mr. Tersten as a comparable. There is insufficient commentary in the appraisal report to support this 2150% increase in value.
- Missing 442. The original appraisal report was completed subject to completion per plans and specifications (i.e., 442). This was not provided in the original loan file.

**Matias, Juan**          RFC #8631215          US #MAIN01259
- Transaction Misrepresentation (see above).
- Churning - Appraisal-Value Misrepresentation. The appraisal report in the original loan file estimated the value of the subject property to be $290,000 as of 3/5/2003. A retrospective review appraisal dated 4/3/2004 obtained by GMAC-RFC revealed a value of $200,000 at the time of origination. Additionally, it was discovered that the subject property and comparables were churned, artificially inflating the value. The subject property sold for $89,000 from Robert A. Wilson to 253 E. 33rd St LLC who in turn sold it to Juan Matias for $290,000 on 3/25/2003. The attached review appraisal provides further detail as it relates to the churning and significant value deviation. GMAC-RFC's review appraisal represents a 32% deviation from the original value resulting in a LTV of 131% which is excessive for this loan program.
- Occupancy misrepresentation. The loan application in the original loan file represents that the purpose of the subject transaction was a purchase of the borrower's primary residence. GMAC-RFC obtained a Haines search revealing the borrower continues to occupy his departure residence listed on the original loan application as 958 East 27th Street, Paterson, NJ. Additionally, the hazard insurance binder in the original loan file indicates "tenant" occupied.

**McKenzie, Valarie**          RFC #8338573          US #MAIN00816
- Transaction Misrepresentation (see above).
- Unable to rely on the accuracy of the information. The borrower has an additional loan (RFC #8376553) also sold to GMAC-RFC by US Mortgage. Material findings include borrower's inability to repay the subject loan and evidence that the subject value was artificially inflated through churning.
- Ability to repay subject loan not established. The original loan application submitted by US Mortgage in the borrowers other loan file (RFC #8376553) that closed 12/30/2002 (2 weeks after the subject transaction) represents that the borrower is employed by Lakeland Healthcare as a nurse earning $6575 monthly base income. The credit report in the subject file reflects the same employer. GMAC-RFC's reverification of employment from Lakeland Health Care Center indicates the borrower's monthly income is $1522.52.
- Based on the foregoing, the borrower's ability to repay the subject loan is not established.

**Robinson, Dorothy**          RFC #8266165          US #MAIN00871
- Transaction Misrepresentation (see above).
- Occupancy misrepresentation. The loan application in the original loan file represents that the purpose of the subject transaction was an equity refinance of the borrower's primary residence. The hazard insurance binder in the original loan file indicates "tenant" occupied. Additionally, copies of the mortgage payments as recent as March, 2004 reflect the borrowers mailing address as her departure residence listed on the original loan application, 393 Howe, Ave, Passaic, NJ.

**Smith, Marva**          RFC #8535929          US #MAIN01222
- Transaction Misrepresentation (see above).
- Churning - Appraisal / Value Misrepresentation. The appraisal report in the original loan file estimated the value of the subject property to be $299,000 as of 2/8/2003. A retrospective review appraisal dated 3/16/2004 obtained by GMAC-RFC revealed a value of $135,000 at the time of origination. Additionally, it was discovered that the subject and comparable

USM 000001514

properties were churned, artificially inflating the value. The attached review appraisal provides further detail as it relates to the churning and significant value deviation. GMAC-RFC's review appraisal represents a 55% deviation from the original value resulting in a LTV of 200% which is excessive for this loan program.

- Misrepresentation of stated income. The loan application in the original file represents the borrowers base monthly income from Valley Hospital is $6275. GMAC-RFC obtained information from Valley Hospital that revealed the borrowers hourly wage was $15.25 per hour, equating to $2,643.33 per month. Based on the foregoing, GMAC-RFC is unable to determine the borrower's ability to repay, as it cannot rely on the accuracy of the information in the original loan file.
- Cash to close not documented. The loan application in the original file represented the borrower had $43,150.75 cash at Fleet Bank available to close the subject transaction. At least $30,000 was required to close. Required verification of borrower assets to close the transaction was not provided. Additionally, it was discovered that the account number represented on the original loan application is not a valid account with Fleet Bank. Based on the foregoing, GMAC-RFC is unable to determine if the minimum down payment of value was paid from the borrower's own cash as required.
- Occupancy. The loan application in the original loan file represents that the purpose of the subject transaction was a purchase of the borrower's primary residence. The hazard insurance binder in the original loan file indicates "tenant" occupied

**Resolution**

Due to the material impact these findings have on the quality of the loan GMAC-RFC must require that you repurchase these loans. The repurchase request is being made in accordance with the representations and warranties outlined in the GMAC-RFC Client Guide.

The repurchase funds or a written appeal with supporting documentation should be received by GMAC-RFC on or before July 16, 2004. If you concur with our findings please order repurchase figures from Jim Ridlehoover at (952) 979-4223. If you have any questions regarding the resolution of this issue please contact me at (952) 979-4385.

Sincerely,

Dorian Whealdon
Repurchase Account Manager
GMAC-Residential Funding

Enc

Cc:     Susan McGrath
        Cathy Solomon
        Jason Mitchell
        Deanna Keith

USM 000001515